IN THE MATTER OF ESTABLISHING A RATE BASE FOR THE HONOLULU GAS COMPANY, LIMITED.

No. 2178.

ARGUED APRIL 24, 25, 26, 1935.          DECIDED JULY 26, 1935.

COKE, C. J., BANKS AND PARSONS, JJ.

490

This is an appeal prosecuted by the Honolulu Gas Company, Limited, from an order of the public utilities commission of the Territory, made on the 28th day of June, 1934. The proceedings were instituted and the order made under the authority conferred upon the commission by sections 2193 and 2202, chapter 132, R. L. 1925. These sections provide: "The commission and each commissioner shall have power to examine into the condition of each public utility doing business in the Territory, the manner in which it is operated with reference to the safety or accommodation of the public, the safety, working hours and wages of its employees, the fares and rates charged by it, the value of its physical property, the issuance by it of stocks and bonds, and the disposition of the proceeds thereof, the amount and disposition of its income, and all its financial transactions, its business relations with other persons, companies or corporations, its compliance with all applicable territorial and federal laws and with the provisions of its franchise, charter and articles of association, if any, its classifications, rules, regulations, practices and service, and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations. Any such investigation may be made by the commission on its own motion, and shall be made when requested by the public utility to be investigated, or upon a sworn written complaint to the commission, setting forth any prima facie cause of complaint. All hearings conducted by the commission shall be open to the public. A majority of the commission shall constitute a quorum." (§ 2193.) "All rates, fares, charges, classifications, rules and practices made, charged, or observed by any public utility, or by two or more public utilities, jointly, shall be just and reasonable, and the commission shall have power, after a hearing upon its own motion, or upon complaint, and in so far as it is not pre-

vented by the Constitution or laws of the United States, by order to regulate, fix and change all such rates, fares, charges, classifications, rules and practices, so that the same shall be just and reasonable, and to prohibit rebates and unreasonable discriminations between localities, or between users or consumers under substantially similar conditions. From every order made by the commission under the provisions of this section an appeal shall lie to the supreme court of Hawaii in like manner as an appeal lies from an order or decision of a circuit judge at chambers. Such appeal shall not of itself stay the operation of the order appealed from, but the supreme court may stay the same, after a hearing upon a motion therefor, upon such conditions as it may deem proper as to giving a bond and keeping the necessary accounts or otherwise in order to secure a restitution of the excess charges, if any, made during the pendency of the appeal in case the order appealed from should be sustained in whole or in part." (§ 2202.)

The investigation instituted by the commission was for a threefold purpose, namely, (1) the establishing of a rate base or fair value of the company's property used and useful for public purposes as of December 31, 1932, (2) fixing a fair rate of return to the company on its investment and (3) after the above two factors have been adjudicated the determination of the rate to be charged to the consumers of manufactured gas.

The company is a local corporation operating under a public franchise, the term of which is fifty years from 1904, granted by the legislature of the Territory of Hawaii and approved by an Act of the Congress of the United States and is and for many years past has been in the business of producing and selling manufactured gas to patrons in and about the city of Honolulu. As incidental to its principal business it also carries on a merchan-

dise department which is devoted to the sale of gas ranges, gas fixtures and other articles necessary or useful to gas users. The hearings before the commission began in October, 1933, and continued at intervals until June, 1934. Voluminous reports by the commission's auditor and engineer and by the engineer for the company were filed with the commission in addition to which a vast amount of both oral and documentary evidence was introduced at the hearings. The commission fixed the rate base at $1,800,000 and also held that seven and one-half per cent net was a fair rate of return to the company based upon the value of its property as above determined. The commission did not determine the gas rate to the consumer, refraining from doing so, we assume, pending the disposition of this appeal.

This is the first instance where the courts in this jurisdiction have been called upon to review an order of the public utilities commission involving the establishment of a rate base, hence we are denied the benefit of any local precedent. The question has, however, on many occasions within the last half century found its way into the courts, both state and federal, throughout the mainland.

In its more general perspective the present appeal involves merely a determination of the rate base or fair value of the property of the company used or useful for utility purposes on December 31, 1932, and the adjudication of what is a fair rate of return for the company upon the value of its capital investment as aforesaid. Of course a just rate to the consumer could, with reasonable accuracy, be ascertained after the value of the property and fair rate of return had been determined. For this reason the sum of the value of the assets of a concern operating as a public utility which is used or is useful for the purposes of the company as such is denominated its rate base but in any proceeding to establish a rate base there often arise

many collateral disputes, differences and issues which present difficult and subtle questions for determination. Such is the case with which we are presently confronted. Counsel for the company in their brief enumerate the following as some of the questions presented by the appeal, namely: "1. What is the value of the company's property used and useful for public utility purposes as of December 31, 1932? 2. What is the proper meaning of 'present value'? 3. What are the main considerations affecting a rate base? 4. Did the commission err in its comparative bases for rate base purposes, and in such comparison did it overlook other important bases? 5. Assuming a rate base is found as of December 31, 1932, has the commission properly protected the company for such purpose as to subsequent capital expenditures? 6. Did the commission err in excluding from the proposed rate base, (a) Iwilei land; (b) the entire merchandising operations of the company; (c) franchise expenditures; (d) general office lease; (e) other specific items? 7. Did the commission err in its decisions on value in, (a) gas production equipment; (b) mains and services; (c) overheads; (d) going value; (e) materials and supplies; (f) working capital? 8. What is a fair rate of return for this company? 9. Is the depreciation annually chargeable to operating expense as fixed by the commission correct? 10. Were the specific recommendations on expense allotments correct or justified?"

The assets of the company consist mainly of gas production equipment, distribution gas mains, storage equipment, meters and regulators, buildings, real estate, leaseholds and miscellaneous tangible property situated in Honolulu, also intangibles such as franchise, going value, etc. Both parties concede that it is the present value, that is, the value on December 31, 1932, of the property both tangible and intangible owned by the company used

and useful in its utility operations which is to be fairly determined and when so determined properly becomes what is known as the rate base. At the hearing before the commission it was stipulated (see Ex. 4) that the reproduction cost new of the principal items of the property held by the company, both utility and nonutility, was $2,525,607. The commission excluded from the foregoing the following items as being nonutility or valueless:

| | | | | | | |
|---|---|---|---|---|---|---:|
| Franchise, | claimed by company to be worth | | | | | $15,000 |
| Real estate, Iwilei, | " | " | " | " " | " | 62,280 |
| Iwilei cottages, | " | " | " | " " | " | 22,949 |
| Bathhouse, Iwilei, | " | " | " | " " | " | 906 |
| General office lease, | " | " | " | " " | " | 36.848 |
| | | | | Total | | $137,983, |

and found that the depreciated value of the utility assets, appraised as aforesaid, was $1,767,702 (see Ex. 9) and to this the commission added $97,000 for going value and $3,000 for patents, making a total value based upon reproduction cost depreciated of $1,867,702.

The company claims that the commission undervalued gas production equipment, street mains, service, overheads, materials and supplies and working capital in the total amount of $310,299. The largest single item of value in dispute is street gas mains, the company's depreciated value being $606,890 and the commission's $465,695—a difference of $138,195. The company also claims that the commission undervalued the going value of the company to the extent of $184,000. The issues involved in this appeal represented by money values contended for by the company and rejected by the commission may be summarized as follows:

| | |
|---|---:|
| Items excluded as nonutility or valueless . . | $137,983 |
| Excess in value over commission's figure . . . | 310,299 |
| Additional claim by company for going value | 184,000 |
| Total . . . . . . . . | $632,282 |

We are therefore called upon to determine whether this amount or any part thereof should be added to the rate base as fixed by the commission.

A corporation carrying on a public utility business, although it owns the property which is employed for accomplishing the public objects, acquires the rights, privileges and franchises subject to the condition that the government creating it or the government within whose limits it conducts its business may, by legislation, protect the public against the exaction of unreasonable charges for the services rendered by it. On the other hand it is equally true that the corporation performing the public services and those financially interested in its business affairs have a right to a reasonable and fair return upon the value of the property devoted to the public services. The determination of the rate base and the fixing of a rate of return become prerequisites to a proper adjudication of what may be a proper charge to those who make use of the public service accorded by the public utility concern.

The commission's authority and power to adjudicate the rate base as well as to fix a fair rate of return to the investor and to establish a reasonable charge to the consumer is conceded. The duty of the commission to act fairly and justly to the utility company as well as to the public is of paramount importance. The fixing of the proper rate and securing adequate service become the crux of this whole matter concerning municipal public utilities and their service. The rate is the most fundamental question of the entire subject because it controls the means by which the public utility is established and maintained and naturally and necessarily where the means are inadequate or insufficient the service is impaired or destroyed. Where the rate received by the public utility for its service is exorbitant and in excess of its value the customer receiving the service is imposed upon by being forced

to pay in excess of the value he receives. The control of these opposing forces and conflicting interests and the right to fix rates in such cases is, in this Territory, reposed in the public utilities commission.

Various plans and formulas have been adopted by courts and public utilities commissions as the basis for ascertaining the value of utility property. These formulas include book value, book value depreciated, original cost new, original cost depreciated, reproduction cost new, reproduction cost depreciated and earning value. But owing to the fact that a gas plant such as that owned and operated by appellant consists of buildings, boilers, pumps, generators, 176.4 miles of underground gas mains, 15,000 meters in service and a great variety of other tangible property in varying stages of depreciation and obsolescence, it becomes a hopeless undertaking to determine the exact value of the property. In ascertaining the percentage of depreciation in an endeavor to determine the value on the reproduction cost depreciated plan the solution necessarily often depends largely upon the judgment and opinions of so-called valuation experts, usually contradictory in their nature and at best a heterogeneous estimate. The commission recites in its decision that it gave the greatest weight to the reproduction cost depreciated method, the result arrived at by the commission being as follows: Reproduction cost depreciated, $1,867,-702; original cost depreciated, $1,600,000; earning value, $1,500,000. The average would be approximately $1,650,-000. The commission, however, found the reasonable value of the property to be $1,800,000. Counsel for the commission in their brief state that this figure was arrived at by applying the weighted percentages to the above respective values resulting in an average weighted figure of $1,809,161.60. We can find nothing in the record justifying the conclusion that the commission arrived at this

figure by resorting to the statistical formula known as weighted average from which the weighted percentage resulted in the commission's conclusion for it is apparent that as a mathematical problem the weighted average of the set of items would not result in $1,800,000. The figure was, we assume, determined upon because the commission concluded that greater stress should be applied to reproduction cost depreciated than to the other method employed by it.

The theory of ascertaining values on reproduction less depreciation is, like all other theories, attended with many difficulties and does not take into account the value of the plant as a going concern with an established income. This latter element of value is generally accepted and should be added in rate base proceedings. As hereinabove indicated the parties agreed that the reproduction cost new of the principal items of property owned by the company was $2,525,607. The commission, after excluding entirely certain items as being nonutility or valueless, found that the depreciated value of what remained was $1,770,702. The company concedes that it was proper for the commission to make use of the reproduction cost depreciated formula but claims that the commission overdepreciated the property to the detriment of the company, wrongfully reduced going value in the extent of $184,000 and erroneously excluded as valueless or as being nonutility other property of the value of $137,983. The company also assails the decision of the commission because it took into account original cost depreciated and earning value formulas. The company contends that the original cost depreciated is not a fair comparative figure and that it does not reflect the present value. The company also contends that earning value has no proper place as a comparative figure and is useless for rate base purposes. The company concedes that there is no set rule which must be

followed to establish a rate base but urges that in this case reproduction cost depreciated plus proper additions is the dominant element to be considered in ascertaining the rate base.

The commission in stating its reasons for taking into consideration the three different bases in order to arrive at the rate base had this to say: "In determining what value shall be placed on public utility property, commissions and courts have in the past evolved many theories or methods in arriving at such value. References appear in the decisions to 'book value,' 'original cost,' 'reproduction cost,' 'earning value' and 'market value.' Of the aforementioned methods or theories of valuation the 'book value' and 'market value' methods are considered by the courts as of minor importance and in most instances are ignored altogether. The greatest weight has been accorded by this commission to the reproduction cost depreciated method but consideration has also been given to the 'original cost depreciated' and 'earning value' methods as well. It may be here remarked that the company itself proceeded upon the theory that the 'reproduction cost depreciated' method was the one which should be given the greatest consideration and it was with respect to the values set up under this method that the greatest dispute arose." No one formula or set of formulas for determining a rate base can be considered as exclusive. Each case, as it arises, must necessarily depend upon the particular facts involved in that case. A pioneer case and one perhaps most quoted is *Smyth* v. *Ames*, 169 U. S. 466. In that decision the court appears to hold that consideration should be given to original cost and probable earning value, and Hartman on Fair Value points out that courts have held that before deciding what, in a given case, may be a fair value, replacement cost and probable earning capacity should be included in the factors to be considered. Under the cir-

cumstances of the present case we believe that reproduction cost depreciated, of all single recognized methods, most accurately indicates the value of the property but it does not follow from that conclusion that the commission was barred from endeavoring to ascertain value by considering original cost depreciated, earning value or by approaching the subject through other recognized channels of inquiry by which a fair valuation might be arrived at. The federal court has said that "a careful study of the cases, however, leads unerringly to the conclusion that one of the most important factors, if not the dominant factor, in determining the true basis of rate making for public utilities is the cost of reproduction new less depreciation of the property of the utility devoted to the public convenience, at the time of making the rates, provided such cost fairly reflects normal and stable prices prevailing at the time, and which will with reasonable certainty continue to prevail throughout the period covered by the rates fixed, so far as reasonable human foresight, measuring the future by the present and the past, can determine." *Pacific Telephone & Telegraph Co.* v. *Whitcomb,* 12 F. (2d) 279, 283. In a contemporaneous case the same court said: "The Supreme Court has now adopted the rule that, at least in the absence of special circumstances controlling otherwise; and not present here, the dominant element in the fixing of a rate base in a case such as is now before us is the reproduction cost, less depreciation, of the property involved." *Monroe Gaslight & Fuel Co.* v. *Michigan Public Utilities Commission,* 11 F. (2d) 319, 321. The Supreme Court of the United States appears to have first recognized the reproduction cost depreciated theory in the case of *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, following which the theory has been repeatedly approved by that court. The language used in the foregoing quotation from *Monroe Gaslight & Fuel Co.* v. *Michigan Public*

500

*Utilities Commission,* does not, in our opinion, have the effect of repudiating the doctrine laid down in *Smyth* v. *Ames, supra,* nor does it, by the use of the terms "dominant factor" and "dominant element" indicate that the single theory referred to is exclusive and that there is no other or different approach to the subject. We think no error was committed by the commission in adopting the three theories of valuation in this case considering, as it did, reproduction cost depreciated as the dominant factor.

The company disagrees with the method employed by the commission in determining depreciation, its principal objection being based upon the use by the commission of what is known as the "straight line method" of computing depreciation rather than the "curved line method." The following, taken from the commission's decision, will illuminate its position: "A ground which proved to be a very fertile one for controversy was the subject of depreciation or rather the method which should be adopted in determining the amount of depreciation. The main disagreement which arose in this regard was as to the respective merits of the 'straight line' and 'curved line' or what is sometimes referred to as 'observed depreciation' methods. The company contends that the straight line method is a commendable one in so far as accounting practice is concerned but is to be disregarded by the commission in allowing for depreciation when the question as to establishing a rate base arises. Regardless of what the commission may think of the merits of such contention it is supported by some decisions to the extent, and to this extent only, that the commission is prohibited from determining the amount of depreciation by deducting from the reproduction cost new values the amount of reserve in the past set up by the company. * * * The 'straight line' and the 'observed' methods of depreciation each has its proponents. The interstate commerce commission as well as many other

commissions throughout the United States adhere to the straight line method. Other commissions have adopted the 'observed' method although it has been severely criticized. * * * However, it is not necessary in this decision for the commission to pass upon the merits of the respective methods for all courts and commissions agree that where inspection or observation of the unit to be valued is impossible, or, although possible, an inspection has not been made then the 'straight line' method may be used. And that is exactly the situation which exists in the instant case. Where the testimony indicates that it was possible to inspect a particular unit, as for example the generators and compressors, and further that an inspection was made then the opinion of any witness as to the actual depreciation observed by him was given consideration. The commission feels, however, that the company's engineers failed to give the factors of obsolescence and inadequacy, which are not subject to determination by actual inspection, the weight they deserved. However, when the commission came to a consideration of street mains and services the observed method of depreciation was of minor importance. The mains as a whole had not been inspected, although in a few isolated instances short lengths of pipe had been. The soil conditions which exist in this community vary to such an extent that a pipe laid in one section of the city may have a long life whereas the same type of pipe laid in another section would have a relatively short one. Mr. Austin has lived in this community for a number of years and as a result of his experience is thoroughly familiar with the soil conditions existing here and the effect of certain types of soil on the mains. Therefore in the case of the street mains and services and certain other units the commission believes that the adoption by it of the 'straight line' method of depreciation is fair to the company and to the public as well. It may be here remarked paren-

502

thetically that the records of the commission disclose that Mr. Sachse in his valuation of the Honolulu Rapid Transit Company in 1924 adopted the 'straight line' method as being the better of the two methods. *(See Decision of Public Utilities Commission of the Territory of Hawaii No. 51 and page 62 of the report of R. Sachse therein mentioned.)* The decision and report also disclose that in Mr. Sachse's opinion the Honolulu Rapid Transit Company, Limited, was operating efficiently at a condition per cent of only 68. *(See pp. 94 and 95 of report and pp. 24 and 25 of the decision.)"* Mr. Sachse was the chief engineer and principal witness for the company at the hearings before the commission.

The fact that the property of appellant consists of many items including structures, gas production equipment, meters and an extensive mileage in underground gas mains, much of which could under no circumstances be observed and in the present case was not observed, in order to determine the amount of depreciation or deterioration from year to year precludes the adoption of the curved-line method in this case. The relative merits of the two methods of admeasuring depreciation are well illustrated in the following language: "The advantages of the straight-line method lie in its simplicity and adaptability to accounting methods. While it assumes that property diminishes in value by a proportionate amount each year, in view of the many divergent views as to just how property depreciates in value during its life in service, and the divergent experience with rates of depreciation of identical kinds or units of property, this assumption seems to be as reasonable as any." The above is a quotation from "Depreciation, a Review of Legal and Accounting Problems," by the staff of the Public Service Commission of Wisconsin, published in 1933. The interstate commerce commission has followed the straight-line method as pointed out by Whit-

ten-Wilcox on Valuation of Public Service Corporations (2d Ed.) Vol. 2, p. 1797. (See also *Minneapolis* v. *Rand,* 285 Fed. 818.) A similar controversy arose in *Western Oklahoma Gas & Fuel Co.* v. *State,* 239 Pac. 588, 590, the court saying: "Whatever theory of depreciation may be adopted, whether it be the straight-line theory or the theory of unit inspection, we realize how futile it is for any one, whether he be expert or layman, to undertake to fix to a certainty the depreciation this gas plant has undergone. The percentage of depreciation has never been standardized, and there is evidently great difficulty to fix an exact standard. If each unit of a plant should be inspected by an expert and its condition separately noted, it would then be only a matter of his opinion as to the extent of depreciation, but such an inspection is rarely if ever made."

In *Erie City* v. *Public Service Commission,* 278 Pa. 512, 534, the court said: "The commission should find the rate to be applied for accrued depreciation. While the company's theory may seem logical, in practice it is well known that plant efficiency depreciates each year on a percentage which can be ascertained with fair accuracy." Pond on Public Utilities (4th Ed.), Vol. 2, at page 1088, says: "In determining annual depreciation to cover the cost of replacing property consumed in operation, the courts sustain the so-called straight-line method, which fixes an even annual charge for this item as operating expense, equal to the service value of the property used up in operation." In *Michigan Bell Telephone Co.* v. *Odell,* 45 F. (2d) 180, the court made use of the following significant language: "We think the master in applying the rule that must be controlling upon us made a proper finding as to accrued depreciation. * * * In determining what amount shall be set up annually as a depreciation reserve to replace property used up in operation, the company uses the so-called 'straight line method.' This method

provides for an equal and constant annual charge, representing depreciation or loss of property consumed in operation."

The advocates of the curved-line method of depreciation, including Mr. Sachse, the company's valuation expert, contend that the straight-line method erroneously assumes that property in use diminishes uniformly throughout its life of usefulness. They emphasize the point that this is an erroneous assumption; that experience has taught that property, and particularly gas mains, depreciates less rapidly during the early stages following installation than at later periods and therefore a curved-line graph alone would indicate the amount of depreciation from the time of installation to the period the property reached a zero value. While this may be true under certain circumstances it is a subject that is highly controversial and it is clear to us that a curved line could not, under the facts of the present case, indicate with an approximate degree of accuracy the amount of depreciation which was gradually diminishing the value of unobserved underground gas mains.

It is not seriously claimed by the company that there was any sort of a complete inspection or observation of the property. It is interesting to note that Mr. Sachse, while endorsing the curved-line method in the present proceeding, at an earlier date appeared before the same commission in behalf of the public in what is known as the *Honolulu Rapid Transit & Land Co.* case and advocated the straight-line theory.

The adherence by the commission to the straight-line theory being justified by the facts and supported by the great weight of authority is approved.

The commission likewise declined to be impressed by the contention of the company that the condition per cent of its plant should not have been reduced below 79% nor

by the evidence of Mr. Sachse to the effect that the lowest possible condition that a gas plant of this nature should go or could go and properly function is 75%. Of course condition per cent is based upon the actual condition of the component parts going to make up the plant and is affected by obsolescence, inadequacy and other factors. It is solely a question of fact to be determined from the evidence. It is conceded that the maintenance of the company's plant has been good and in giving the plant a 66.5 condition per cent the commission's finding was supported by the testimony of Mr. Austin who in fact set a lower condition per cent than that found by the commission. We therefore do not feel warranted in disturbing the action of the commission.

The company emphasizes the further point that in fixing the value of the company's property the commission failed to consider any estimate of value for a reasonable period in the future because rates being fixed for the future, the value of property to be used in the future becomes necessary in order to get a true perspective of the rate base. It seems to us that this, under ordinary circumstances, is an element which should be taken into consideration and is sanctioned by the decision in *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, also in the case of *Pacific Telephone & Telegraph Co.* v. *Whitcomb, supra.* The commission said on the subject: "The valuation of the company's property, however, is as of December 31, 1932. It has been the practice of some commissions to allow for future capital expenditures in establishing a rate base. Such, however, has never been the practice of this commission. Its practice, in this regard, has been to value the utility as of a given date granting to the utility the right at any time subsequent to the entry of the order, to show any additional capital expenditures made by it since the date set for the valuation. When this is done the

amount of the additional expenditures is automatically added to the rate base and accrued depreciation on original cost of total utility property assets is deducted. By this method the necessity of 'estimating' the amount of capital expenditures is obviated and conjecture eliminated. Therefore, the sum of $247,000 is disallowed with the right granted to the company to submit to the commission, at any date subsequent to the entry of the order herein, satisfactory evidence of the amount of capital expenditures made since December 31, 1932, and upon the receipt of such evidence the rate base will be altered accordingly."

The company finds fault with this attitude of the commission on the ground that while the commission recognized that the company is entitled to an allowance for increasing future capital expenditures it withheld the benefits of it from the company and left the subject open to be adjudicated at some later period.

The Supreme Court of the United States in the *Indianapolis Water Co.* case, *supra,* p. 408, has announced the rule that "in determining present value, consideration must be given to prices and wages prevailing at the time of the investigation; and, in the light of all the circumstances, there must be an honest and intelligent forecast as to probable price and wage levels during a reasonable period in the immediate future. In every confiscation case, the future as well as the present must be regarded. It must be determined whether the rates complained of are yielding and will yield, over and above the amounts required to pay taxes and proper operating charges, a sum sufficient to constitute just compensation for the use of the property employed to furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation and for a reasonable time in the immediate future." (See also *Board of Public Utility Commissioners* v. *New York Telephone Co.,* 271 U. S. 23; *Fort Worth Gas Co.* v. *City of Fort Worth,* 35 F. [2d] 743.)

The company's valuation engineer, Mr. Sachse, testified (see tr. pp. 277-282) to the effect that a reasonable forecast of price levels for a reasonable period in the future, that is, 1933 and 1934, would entail an increased outlay on the part of the company to the extent of $247,000. The witness emphasized the fact that because of the uncertainty of the future it was difficult to make an accurate estimate of future price levels. We have no doubt of the soundness or justice of the principle contended for by appellant but we disagree with its contention that the future expenditure estimated at $247,000 should have been added to the rate base as of December 31, 1932, for the obvious reason that at that time the additional expense had not been incurred and it follows that the company would not be entitled to a return on an investment that had not yet been made. We are convinced that the federal court did not intend to give voice to a contrary view. The decision of the commission does justice to all concerned. It left the subject open for future determination so that the company might, from time to time at reasonable periods, appear before the commission and offer proof of any additional outlay made necessary by increased wage rates or higher commodity prices and obtain from the commission an order increasing the rate base proportionately. We take judicial notice (see *McCardle* v. *Indianapolis Water Co., supra,* and *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio,* 292 U. S. 290) that since December 31, 1932, there has been an upward trend in price levels affecting both wages and materials and the company is justly entitled to a fair return upon its increased expenditures made necessary by this economic evolution.

The company claimed a going concern value of $281,000. The commission allowed $97,000. In determining the value of property for rate purposes there is an element of value in an assembled plant in full operation with capacity

508

to furnish service and earning money over one not thus advanced and this element of value is a property right which should be considered in determining the value of the property upon which the owner is entitled to receive a reasonable return. It does not give license to mere speculation. It calls for consideration of the history and circumstances of the particular enterprise in each separate case and attempts at precise definition should be avoided. (See *Los Angeles Gas Co.* v. *Railroad Commission,* 289 U. S. 287; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Denver Union Stock Yard Co.* v. *United States,* 57 F. [2d] 735.) The pioneer definition of going value in the federal courts was by Circuit Judge Brewer, in *National Waterworks Co.* v. *Kansas City,* 62 F. 853. In *Knoxville* v. *Knoxville Water Co., supra,* p. 9, the court defined going value to be "an expression of the added value of the plant as a whole over the sum of the values of its component parts, which is attached to it because it is in active and successful operation and earning a return." This appears to be the first instance where the Supreme Court of the United States gave much attention to the subject and in that case permitted a small allowance for organization, promotion and going value. Following the rendition of these decisions many utility concerns throughout the country seized with avidity upon this new-found, nebulous and illusive theory of intangible property value and proceeded to utilize it as the basis for asserting inflated values and the consequent levy of unjust tribute upon the consuming public. One such case is *Galveston Electric Co.* v. *City of Galveston,* 272 F. 147 (and many other instances might be cited). In that case one of the important matters in dispute was an item of $530,000, claimed by the company and allowed by the master as development cost or going concern value. This item was rejected by District Judge Hutcheson. The case finally reached the United States Supreme Court (see *Galveston*

*Electric Co.* v. *Galveston,* 258 U. S. 388). The Federal Supreme Court upheld the decree of the district judge and in the opinion of an undivided court it is made clear that the costs of establishing the system (street railway) as a physically going concern or the cost of converting the inert railway plant into an operating system is found in overhead expenses which are ordinarily treated as a part of the cost of construction. Going value, to be allowed as a separate item in addition to overheads, must be something different from assembling the parts of property, co-ordinating them and transferring them into an operating system.

It perhaps should be emphasized that going value should not be confused with good will. Good will, as well as going value based thereon, has been repeatedly rejected by the courts as an element of value for rate-making purposes. (*Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153; *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19.) In *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 U. S. 655, the court did not clearly define going value but did overrule a decision by the supreme court of the State of Iowa because it had excluded going value. In the *McCardle* v. *Indianapolis Water Co.* case, *supra,* the court sustained a going value of 9.5%, pointing out that the evidence was more than sufficient to sustain that figure "when the impressive facts reported by the commission in this case are taken into account." There appears to be much confusion in the decisions of courts, commissions and opinions of experts as to what is going value, as well as how it should be measured. In *Galveston Electric Co.* v. *Galveston, supra,* the court called attention to the confusion due to a misunderstanding of what the term implies and indicating that in cases where the item had already been compensated in rates charged and collected the company could not again receive recoupment under the guise of going value, the court proceeding to say (p. 396): "Going concern value

and development cost, in the sense in which the master used these terms, are not to be included in the base value for the purpose of determining whether a rate is confiscatory." Courts will not extract from consumers income upon a sum which has already been returned to the company as income, but going concern value, which may be likened to the unearned increments of real estate, is recognized as a type of property which a utility concern is entitled to have considered as a part of its investment. (See 2 Pond on Public Utilities [4th Ed.] § 600; *Natural Gas Co.* v. *Public Service Commission,* 95 W. Va. 557, 121 S. E. 716.) The federal circuit court of appeals in *City of Minneapolis* v. *Rand,* 285 F. 818, approved an allowance of $500,000 for going value upon the property of a gas company valued at $7,433,763, which did not include intangibles. But here again each case must be controlled by its own circumstances and we must not be understood as laying down an immutable rule that can properly be applied in all rate base proceedings.

The allowance by the commission in the present case of $97,000, is in harmony with the action of the federal court in the *Minneapolis* case. The finding is supported by the record and by the authorities and is therefore sustained. For like reasons we sustain the action of the commission in the disallowance of the excess amounts claimed by the company over the allowances of the commission as follows: Gas production, $43,257; street mains, $137,159; service, $20,710; overheads, $40,829; materials and supplies, $40,155, except from the latter item the sum of $9,400, representing the value of oil and stationery on hand and wrongfully excluded by the commission, should be deducted.

To the $1,800,000 found by the commission as the rate base must therefore be added the sum of $9,400 and the value of such items including working capital, if any, as may be found to have been wrongfully excluded by the

commission as nonutility. These items are, Iwilei real estate, $62,906; Iwilei cottages, $62,949; franchise, $15,000; general office lease, $36,848; merchandise and supplies, $36,420, the latter being the value of assets of the company's so-called merchandise business claimed by the company to be a proper utility operation and $27,153 working capital required in the latter company activities. These items will be considered in the order named.

We now are brought to a consideration of the propriety of the action of the commission in excluding as nonutility certain land and buildings owned by the company situated at Iwilei adjacent to its main plant. In disposing of this subject the commission says: "Account number 311 concerns certain land located at Iwilei on which a number of cottages are situated. The land is valued at $62,280 and the cottages (account No. 312) at $22,949 which values are conceded by the commission's auditor and engineer who contend, however, that the land and cottages thereon are nonutility and therefore are not to be considered by the commission in establishing a rate base. Some of the cottages are occupied by the company's employees, others are rented by the company to nonemployees. In an endeavor to have the land and cottages included in the rate base the company contends that in order for it to render satisfactory service to the public certain of its employees must at all times during the day and night be available. Even granting such to be the case, only a few of the cottages are occupied by the company's employees and the others are rented to nonemployees. The commission therefore disallows $62,280.00 account 311 and $22,949.00 account 312 as being nonutility but will permit the company in the future if it so desires, to set up an account designated, for example, as 'Rental Expense' and charge against this account as an operating expense the difference in amount between rental received for a cottage from a nonemployee

and that received for a similar cottage from an employee upon the theory that the presence of a limited number of employees is necessary to the efficient operation of the plant." Neither the value of the land nor of the buildings is in dispute. It is solely a question of whether the premises may rightfully be deemed to be utility property under the recognized definition of that term. It appears from the evidence that there are in all thirty-four cottages and two stores on the premises. Twenty-one of the cottages are rented to employees and the remaining thirteen and the two stores are under lease to nonemployees. The net income from the rents averages $5,013 annually. Employees are favored by a substantial rent reduction below that charged others. Witnesses for the company have testified that it is a convenience and a saving to the company to be able to house its employees in quarters close to its plant. Approximately 40% of the property is utilized for purposes entirely nonutility and the portion thereof which is occupied by employees of the company can at most be said to be but partially incidental to the utility operations. The subject has been exhaustively and ably dealt with by the Maine public utilities commission in *Fort Fairfield Light & Power Co.* v. *Maine Public Service Co.,* P. U. R. 1933B 493. One of the headnotes contains the following: "Maintaining dwelling houses for rental, even to utility employees, does not fall within classes of property from which the general consuming public gets a direct benefit in the product or service which the utility is supplying, and may not accordingly be included in the rate base." Bearing in mind that the company is entitled to compensation for the use of property employed to furnish service, as was said in the *Indianapolis Water Co.* case, *supra,* or "a just and reasonable return on the value of the property used to perform the service covered by the rate," as was said in *Banton* v. *Belt Line Railway Corp.,* 268 U. S. 413,

414, or "a fair return upon the value of its property devoted to the public service," as was said in *S. W. Bell Tel. Co.* v. *Public Service Commission*, 262 U. S. 276, or "adequate compensation for the use of its property employed, and necessarily employed, in the public service" and "property useful and actually used in a public service," as was said in *Denver* v. *Denver Union Water Co.*, 246 U. S. 178, 190, we conclude that, upon these affirmative definitions of the property to be included, the land and buildings above referred to must fall within the excluded class.

The company argues that the commission erred in excluding from the rate base the item of $15,000 which it asserts would be the reproduction cost of its franchise. The purpose of a franchise is to transfer to the individual or company the special privilege of exercising part of the state's sovereign power, namely, the right to use the public highways in a manner imposing an additional burden and the right to condemn private property. The franchise value to the utility lies in the fact that it enables the company to go ahead and engage in the undertaking. It changes the plant from an inactive to an active organization. The value thus conferred is allowed in rate making by appraising the value as a going concern. It cannot be allowed a second time under any alias however attractive it may sound. That a franchise has value is not to be denied and the state recognizes and taxes such value. This value is also recognized in purchase and sale cases and in condemnation proceedings. In rate cases this element is almost uniformly excluded. (See *Cedar Rapids Gas Co.* v. *Cedar Rapids, supra; Georgia Ry.* v. *R. R. Comm.*, 262 U. S. 625.) Of course the rule would be different where, as in *Willcox* v. *Consolidated Gas Co., supra*, the subject is controlled by statute and in cases where the original grantee had paid to the state compensation for the franchise but no such special circumstances exist here. What

a person or corporation may have paid to another person or corporation for a franchise is not controlling. The franchise account is limited to the amount paid by the original grantee to the franchise-granting authority. "It is clear from the court decisions already cited in this chapter, that while the value of the franchise is to be excluded from the rate base, the actual cost of the franchise, represented by the amounts paid by the utility in the first instance to governmental bodies for the franchise, may be included. Apparently, this does not mean a theoretical estimate of expenses that would necessarily be incurred in procuring a franchise, but only the payments actually made to public bodies for the existing franchise at the time it was granted." 2 Whitten-Wilcox on Valuation of Public Service Corporations (2d Ed.) 1208, 1209. The position of the company is that this item of $15,000 would become a necessary expenditure were the company required at the present time to procure legislation granting to it the franchise which it now enjoys. This is not a persuasive argument. The company is in possession of a franchise which has years to run and which of course is intangible. It seems to us that this theoretical estimate of what it would cost to procure a franchise if one did not exist carries us into the realm of speculation in regard to an imaginary expense which can have no part in the fixing of a rate base. We do not doubt, as was testified to by Mr. Castle, that were it necessary for the company to obtain a new franchise or the renewal of its present one the costs and expenses incidental thereto would exceed $15,000 but we are unable to agree with the company that it is proper now to add this amount to the rate base. The company's theory involves a conjectural and fictitious element which the commission properly refused to accede to.

The commission also disallowed the item of $36,848 claimed by the company as the value of the leasehold cover-

ing the main office of the company situated on King Street, which sum included cost of the improvements placed thereon by the company. In disposing of this subject the commission said: "On April 22, 1921, C. C. Cunha, trustee of the estate of C. S. Cunha, leased the property now occupied by the company as its general office to George Lycurgus for a period of thirty years from July 21, 1921, at the rate of $225.00 per month during the first fifteen years and one month and $400.00 per month for the remaining fourteen years and eleven months, all taxes, rates, assessments, impositions, duties, charges, etc., to be paid by the lessee. The lease was assigned to the Honolulu Gas Company, Limited, on October 12, 1927, for a cash consideration of $36,000.00. The property leased has a frontage on King Street of 29 feet and a depth of approximately 92 feet with an area of 2,668 square feet. In determining whether or not the leasehold has any value it is immaterial whether the commission proceeds upon the reproduction cost theory or considers the market value of the leasehold as of December 31, 1932, as in either event the same conclusion is reached, that is, that the leasehold is valueless. For the reasons stated above the sum of $36,848.00 is disallowed." Here again the decision is supported by the evidence. Mr. Fernandes, a qualified expert on the subject, testified that the lease was a liability as distinguished from an asset and therefore possessed no market value. He pointed out that the rental required to be paid to the landlord plus other incidental carrying charges which fell upon the tenant far exceeded estimated income. It seems to us if this evidence was worthy of belief, and it was uncontradicted, the item was properly rejected by the commission as having no place in the rate base. The Federal Supreme Court has repeatedly held that what a company is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of the

516

property at the time it is being devoted to public use. A company is entitled to the benefits of wise and judicious investments but on the other hand if it make an investment or enter into a contract which is reckless or improvident or which turns out to its disadvantage, the loss sustained is not underwritten by the community. *(Minnesota Rate Cases,* 230 U. S. 352.)

It appears from the record and the evidence introduced in behalf of appellant that the company has, for a considerable period, carried on in connection with its other activities, a merchandise business devoted to the sale locally of gas stoves, gas heaters, gas refrigerators and other gas appliances. It is the claim of the company that the material and supplies carried in connection with the latter enterprise were of the value of $36,420 and that it was entitled to additional working capital for the purpose of successfully financing the aforesaid business to the extent of $27,152. On this subject the commission says: "Evidence was adduced by the company to further its contention that merchandising cost, salaries, general office rent, expenses of soliciting, demonstrating and advertising are all utility charges inasmuch as the maintaining and furthering of the company's merchandising department was necessary and tended to increase gas consumption. While sales of gas appliances do tend to increase gas consumption the commission holds that merchandising costs are not proper charges against the utility department. The accounts of general office rent, salaries, demonstrating and soliciting and advertising must be segregated so as to reflect utility charges solely. Nonutility expenses have no place here in arriving at the net utility income. The commission therefore finds that the expenses should be and hereby are allocated and divided on the following basis, to-wit," following which the commission allocated as between what it deemed to be utility and nonutility activi-

ties, general office rent, salaries and expenses, advertising, demonstrating and soliciting. It appears that the merchandise business as well as the conceded utility business of the company is housed in its general office and headquarters in the leasehold premises hereinabove referred to. If the commission was correct in its conclusions that the merchandise activities of the company were nonutility it follows that the same had no proper place in the rate base and the division of expenses on the above basis was justified. The uncontroverted evidence shows that the merchandise business of the company constituted but approximately ten per cent of the company's total operations, that it returned slight, if any, profit to the company and was carried on solely for the purpose of promoting or increasing the demand for manufactured gas throughout the territory in which the company was supplying that product. There is ample authority to sustain the principle that a company will not be permitted to charge as an operating expense of its public utility activities separate merchandising or other nonutility enterprises but on the other hand we believe it to be well settled that where a gas manufacturing company engages in the sale of gas appliances not as an independent or profit-making vocation but to encourage and stimulate the sale of gas, the merchandising thus carried on is a business activity beneficial to the consuming public because the increased use of gas necessarily tends to lower the rate to the consumers and the assets and capital thus devoted should be included within the property to be appraised in determining the rate base. "In the operating expenses, but not segregated in the books of the company, are included expenses for conducting the business of selling gas appliances. It is the practice of this and other gas companies to conduct such business, partly to aid consumers in securing gas appliances manufactured under standard specifications that will thus ren-

der most efficient service to the consumers, and partly, by thus promoting the sale of appliances to be used for additional purposes, to increase the sale of gas. A company, in order to secure these advantages, may sell such appliances either at actual cost or at a slight advance, crediting to revenue the amount realized therefrom." *Kings County Lighting Co.* v. *Prendergast,* 7 F. (2d) 192, 205. (See also *Borough of Wyoming* v. *Luzerne County Gas & Electric Co.,* P. U. R. 1922A 48, 56; *Moncton* v. *Moncton Tramways Elec. & Gas Co.,* P. U. R. 1932B 368.) For the same reason, reasonable expenses incurred in procuring new business or in the endeavor to procure it should be incorporated into the rate base. *West Ohio Gas Co.* v. *Public Utilities Commission of Ohio,* 294 U. S. 63, 72.

The sum of $36,420, representing the value of material and supplies held in connection with the company's merchandise business and the sum of $27,152 additional working capital required in that connection should be included in the rate base and it follows that paragraphs V-IX inclusive should be eliminated from the order issued by the commission. We therefore conclude that the rate base should be fixed at the sum of $1,872,972.

And finally we are confronted with the necessity of determining what should be allowed to the company as a fair rate of return or fair earnings on the rate base thus established. There is no particular rate of compensation which must in all cases be regarded as fair earnings for capital invested in business enterprises. Locality, risks incurred and prevailing local rates on similar investments are all factors to be considered. Fair return is the percentage rate of earnings on the rate base allowed the utility after making provision for operating expenses, depreciation, taxes and other direct operating costs. Of course out of the allowance for fair return the company must pay interest and other fixed charges, also dividends on stock and

appropriations to surplus. The commission found that the fair rate of return to the company is seven and one-half per cent. The company contends for nine per cent and asserts that under the evidence eight per cent is the minimum rate that can be sustained. The Supreme Court of the United States has said: "It is manifest that just compensation for a utility, requiring for efficient public service skillful and prudent management as well as use of the plant, and whose rates are subject to public regulation, is more than current interest on mere investment. Sound business management requires that after paying all expenses of operation, setting aside the necessary sums for depreciation, payment of interest and reasonable dividends, there should still remain something to be passed to the surplus account; and a rate of return which does not admit of that being done is not sufficient to assure confidence in the financial soundness of the utility to maintain its credit and enable it to raise money necessary for the proper discharge of its public duties." *United Railways* v. *West,* 280 U. S. 234, 251, 74 L. Ed. 390. Fair return is something over and above the usual interest rate on well-secured loans to compensate for the risks and hazards of business and for the profits of management. The commission recognized the element of risk and after calling attention to the fact that five and one-half per cent was the average interest rate on bonds listed on the Honolulu exchange added two per cent, saying in that connection that "the risks inherent in the operation of the particular utility under consideration are not sufficiently high to warrant a return more than two per cent above the going interest rate on such bonds as are mentioned above." Witnesses were called by the company and testified that the going rate of interest in Honolulu on sound collateral loans is seven per cent but it must not be overlooked that these witnesses were referring to a gross rather than to a net return.

In *Minneapolis* v. *Rand, supra,* the circuit court of ap-

peals sustained, as against the attack of the city on the ground that it was excessive, seven and one-half per cent found by a special master and approved by the district court as a fair and reasonable rate of the capital investment. In *Bluefield Co.* v. *Public Service Commission*, 262 U. S. 679, 693, Mr. Justice Butler, author of the court's opinion, refers with approval to the decision of the Supreme Court in *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, which "held that the question whether a rate yields such a return as not to be confiscatory depends upon circumstances, locality and risk, and that no proper rate can be established for all cases; and that, under the circumstances of that case, 6 per cent was a fair return on the value of the property employed in supplying gas to the City of New York, and that a rate yielding that return was not confiscatory." In *McCardle* v. *Indianapolis Water Co., supra,* the court sustained seven per cent as a reasonable rate of return in the circumstances of that case. In *Fort Worth Gas Co.* v. *City of Fort Worth, supra,* it was held that a satisfactory rate for compensation to the gas company of seven per cent of the value of its physical property was not as a matter of law confiscatory in view of the favorable situation of the company as found by the commission and the master in chancery. In the case decided by the Federal Supreme Court on April 30, 1934, that is, *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio, supra,* the court made use of the following significant language (p. 311) : "The appellant contends that to avoid confiscation the rate of return should be 8 per cent, instead of 6½, which was allowed. In view of business conditions, of which we take judicial notice (*Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 284 U. S. 248, 260), the rate allowed was adequate." (See *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U. S. 287, where the court approved a return of seven per cent.

See also *Re United Fuel Gas Co.* P. U. R. 1932B 61; *Re Electric Rates for Cotton Ginning,* P. U. R. 1933A 243; *Re Kentucky-Tennessee Light & Power Co.,* P. U. R. 1932E 386.) In *Michigan Bell Telephone Co.* v. *Odell, supra,* the federal district court said (p. 183): "We confirm the master's finding that 7 per cent. is a rate of return that will avoid confiscation." In the light of these controlling authorities and the facts developed at the hearing, we have no hesitation in approving the action of the commission in fixing the company's rate of return at seven and one-half per cent per annum.

We take judicial notice of the fact that during the extended period which has elapsed since the rate date a pronounced downward trend in money rates has set in but in this appeal we are concerned solely with conditions existing as of December 31, 1932.

Many of the issues of fact involved in this controversy were decided by the commission upon the conflicting testimony of expert witnesses. A decision by the public utilities commission will be regarded by this court as having the same force and effect as the decision of a circuit judge at chambers. Such has been the uniform attitude of this court toward findings of fact of tax appeal courts (see *Tax Assessment Appeals,* 11 Haw. 235) and we can conceive of no reason which would justify our giving less weight to the findings of the public utilities commission. An appellate court should not substitute its judgment for that of the commission, whose findings will be presumed to be reasonable if supported by sufficient evidence to uphold it. In the case of *Town of Harrisville* v. *Public Service Commission,* 103 W. Va. 526, 529, 138 S. E. 99, this principle was voiced, the court saying: "We cannot substitute our judgment for the judgment of the commission, on the weight of evidence. Its findings are presumed to be reasonable, lawful and correct, and will not be set aside by

522

this court if based upon substantial evidence. 'Findings of fact by the public service commission, based upon evidence to support them, generally will not be reviewed by this court.' * * * Nor will such findings be disturbed on appeal unless the commission has acted so arbitrarily and unjustly as to fix rates contrary to the evidence, or without evidence to support them. * * * The value of evidence in rate proceedings varies, and the weight to be given to it is peculiarly for the body experienced in rates, and familiar with the intricacies of rate making." As was pertinently said in the *Minnesota Rate Cases, supra* (p. 433) : "We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the commission lawfully constituted by it, as to matters within the province of either."

That this opinion may not extend to undue proportions we have purposely refrained from specifically discussing some of the many issues presented by appellant in this appeal, although every such issue has been carefully considered by us. The commission, we think, as hereinbefore pointed out, erred in excluding from the rate base the items of oil and stationery in hand valued at $9,400; the company's merchandise stock valued at $36,420 and the working capital necessary to efficiently carry on that branch of the company's activities amounting to $27,152, and in the allocation of rents, salaries, etc., set out in paragraphs V-IX inclusive in the commission's order. In every other respect we find the decision and order of the commission free from error.

Our conclusions therefore are that the company's rate base as of December 31, 1932, should be fixed at the sum of $1,872,972; that seven and one-half per cent per annum is a fair rate of return to the company computed on the rate base.

The order appealed from is therefore reversed in part

and sustained in part and the cause is hereby remanded to the commission with instructions to amend the order to accord with this opinion.

*A. L. Castle* (*Robertson & Castle* on the briefs) for the Honolulu Gas Company.

*J. V. Hodgson,* Deputy Attorney General (*W. B. Pittman,* Attorney General, and *M. E. Winn,* Deputy Attorney General, on the brief), for the Public Utilities Commission.