In the Matter of the Application of HAWAII ELECTRIC LIGHT CO., INC., for Approval of Rate Increases and Revised Rate Schedules

NO. 6111

APRIL 24, 1979

RICHARDSON, C.J., OGATA AND MENOR, JJ.,
RETIRED JUSTICE KOBAYASHI AND
CIRCUIT COURT JUDGE KATO ASSIGNED
BY REASON OF VACANCIES

OPINION OF THE COURT BY OGATA, J.

This is an appeal from Decision and Order No. 4123 of the Public Utilities Commission of the State of Hawaii (Commission) and from the Commission's denials of the Petitions for Reconsideration and Successive Petition for Reconsideration. See Order No. 4205 and Order No. 4261. The parties to this appeal are the State of Hawaii Public Utilities Division (Division) and Lima Kokua (LK), as appellants, and the Hawaii Electric Light Company, Incorporated (HELCO), as appellee. HRS §§ 91-14 and 269-16(f) (1976) provide the jurisdiction for this appeal.

In the proceeding below, the Commission issued Decision and Order No. 4123 which, among other things, approved HELCO's request for (I) an 8.95% rate of return on HELCO's rate base and (II) a revised residential rate structure. The Division and LK each challenge different aspects of the case on appeal. The Division's basic challenge is whether the 8.95% rate of return is just and reasonable, and LK's basic challenge is whether the revised rate scheduled for residential customers is unreasonably discriminatory.

We affirm the Commission's order with respect to the rate of return but remand to the Commission for further proceedings with respect to the residential rate schedule.

*PRELIMINARY FACTS*

On January 30, 1975, HELCO, a wholly owned subsidiary of Hawaiian Electric Company, Inc. (HECO), and a public utility engaged in the production, transmission, distribution

and sale of electricity on the island of Hawaii, filed an application pursuant to HRS § 269-16 (1974 Supp.) requesting approval of proposed rate increases and revised rate schedules. HELCO requested a rate increase of $3,508,200, or a 20.3% increase in test year annual revenues, which would amount to an 8.95% return on its proposed rate base.

By law, the Division was a party to the rate proceeding before the Commission. LK, an organization of low income residents of the island of Hawaii, was allowed to intervene. Public and economic hearings were held by the Commission in Hilo and Kona.

On January 29, 1976, the Commission issued Decision and Order No. 4123 which approved the requested 8.95% rate of return. The order also granted HELCO a rate increase of $3,411,400 or a 20% increase in annual revenues and approved virtually unchanged the proposed rate schedules submitted by HELCO.

The Division and LK filed petitions for reconsideration, urging as grounds for reconsideration the same issues each now raises on appeal. On March 30, 1976, the Commission issued Order No. 4205 which denied the petitions. LK then filed a Successive Petition for Reconsideration which was denied by Commission's Order No. 4261. This appeal follows from Decision and Order No. 4123 and the subsequent denials of the petitions for reconsideration.

*DISCUSSION*

The issues presented to us in this appeal are (I) whether the 8.95% rate of return is reasonable and (II) whether the residential rate structure is unreasonably discriminatory.

Before turning to the issues, we note that our standard of review of this case is limited by HRS § 91-14(g) (1976), which provides that:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the

petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

    (1) In violation of constitutional or statutory provisions; or

    (2) In excess of the statutory authority or jurisdiction of the agency; or

    (3) Made upon unlawful procedure; or

    (4) Affected by other error of law; or

    (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

    (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

This court has articulated various descriptions of its role in reviewing the determinations of administrative tribunals. In *In Re Application of Kauai Electric Division*, 60 Haw. 166, 590 P.2d 524 (1978), and in *De Victoria v. H & K Contractors*, 56 Haw. 552, 558, 545 P.2d 692, 697 (1976), we explained that administrative decisions are measured against the clearly erroneous test, *viz.*, "whether the appellate court is left with a firm and definite conviction that a mistake has been made." In *DeFries v. Association of Owners*, 57 Haw. 296, 303, 555 P.2d 855, 859 (1976), we explained that this standard gives an appellate court greater leeway in exercising its functions and that although there is evidence to support an agency finding, if the court is left with a firm and definite conviction that a mistake has been made, the court will, under the clearly erroneous rule, reject the tribunal's findings. *See* Wright and Miller, Federal Practice and Procedure: Civil § 2585 (1971); 2 Cooper, State Administrative Law 744-746 (1965); K. Davis, Administrative Law § 29.02 (3d Ed. 1972).

It is the Commission that is authorized to fix "just and reasonable" rates to be charged by public utilities, HRS § 269-16 (1976), and a reviewing court is not empowered to examine the case *de novo*. *See Mechanic Falls Water Co. v. Public Utilities Commission*, 381 A.2d 1080 (Me. 1977); *Davenport Water Co. v. Iowa State Commerce Commission*,

___ Iowa ___, 190 N.W.2d 583 (1971). In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944), *quoted in In re Application of Kauai Electric Division, supra,* 60 Haw. at 187, 590 P.2d at 538; *Savannah Electric and Power Co. v. Georgia Public Service Commission,* 239 Ga. 156, 236 S.E.2d 87 (1977); *Louisiana Power & Light Co. v. Louisiana Public Service Commission,* 343 So.2d 1040 (La. 1977); *Alabama Gas Corp. v. Wallace,* 293 Ala. 594, 308 So.2d 674 (1975). An agency's findings, if supported by reliable, probative and substantial evidence, will be upheld. HRS § 91-14(g) (1976); *see City of Milford v. Illinois Commerce Commission,* 45 Ill. App.3d 733, 359 N.E.2d 1143 (1977); *Louisiana Power & Light Co. v. Louisiana Public Service Commission, supra,* 343 So.2d at 1044; *Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 555 P.2d 163 (1976); *Alabama Public Service Commission v. Cooper Transfer Co.,* 295 Ala. 209, 326 So.2d 283 (1975); *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 216 N.W.2d 841 (1974).

## I. *RATE OF RETURN*

The commission found a reasonable rate of return to be 8.95%. Previously, in 1974, in Docket No. 2186, Decision and Order No. 3499, the Commission had authorized an 8.95% rate of return on the rate base and a set of rates to produce, hopefully, this rate of return. It turned out, however, that the actual earnings, at the new rates, produced a 6.6% rate of return, which was lower than the authorized fair level. This situation gave rise to HELCO's request for rate relief in the

form of increased customer rates. These proposed increases were calculated to produce a return of 8.95% on its proposed rate base. Although HELCO felt that a fair rate of return was currently higher than 8.95%, it requested that percentage figure so as to expedite the rate proceedings before the Commission.[1]

On appeal, the Division maintains that the finding that 8.95% is a fair and reasonable rate of return is clearly erroneous because A) it is not supported by reliable, probative and substantial evidence, and B) the procedure before the Commission impermissibly shifted the burden of proof. We disagree.

> A. Whether the finding of an 8.95% rate of return is supported by reliable, probative and substantial evidence.

In Decision and Order No. 4123 at pp. 22-23 the Commission found that:

> (1) HELCO is not earning the 8.95 rate of return allowed by the Commission in Decision and Order No. 3499, Docket No. 2186 (1974) but rather a rate of return substantially lower than allowed in that case;

> (2) HELCO's composite cost of capital has increased from 8.95% in 1973 to 9.32% at the end of the test year 1974 because of increase embedded cost of bonds and preferred stock (utilizing the same 13% return on common equity);

> \* \* \* \* \*

> (4) due to continued inflation and increased costs of capital since Decision and Order No. 3499 in Docket 2186 (1974), there is evidence to justify in this case a rate of return of 8.95%; and

> (5) since the Company has only requested an 8.95% rate of return and has based its rate increase request on this figure, the Commission adopts an 8.95% rate of return in its order.

---

[1] See note 3, *infra.*

The Division argues that the record reflects no reliable, probative, substantial evidence to support the Commission's finding that 8.95% was a reasonable or fair rate of return. A return is deemed "fair" or "reasonable" if it produces a fair rate of return on the rate base. *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* 381 A.2d at 1095; *Pennsylvania Gas and Water Co. v. Commonwealth,* 33 Pa. Commw. Ct. 143, 381 A.2d 996 (1977); *Peoples Natural Gas Division v. Public Utilities Commission,* \_\_\_ Colo. \_\_\_, 567 P.2d 377 (1977).

A fair return is the percentage rate of earnings on the rate base allowed a utility after making provision for operating expenses, depreciation, taxes and other direct operating costs. *Honolulu Gas Co. v. Public Utilities Commission,* 33 Haw. 487 (1935); *Narragansett Electric Co. v. Harsch,* 117 R.I. 395, 368 A.2d 1194 (1977); *Providence Gas Co. v. Burman,* \_\_\_ R.I. \_\_\_, 376 A.2d 687 (1977); *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* 381 A.2d at 1095. Out of such allowance the utility must pay interest and other fixed dividends on preferred and common stock. *Honolulu Gas Co. v. Public Utilities Commission, supra,* 33 Haw. at 518-519; 1 Priest, Principles of Public Utility Regulation 191 (1969). In determining a rate of return, the Commission must protect the interests of a utility's investors so as to induce them to provide the funds needed to purchase plant and equipment, and protect the interests of the utility's consumers so that they pay no more than is reasonable. *Honolulu Gas Co. v. Public Utilities Commission, supra,* 33 Haw. at 495; *Providence Gas Co. v. Burman, supra,* \_\_\_ R.I. at \_\_\_, 376 A.2d at 699-700; *Narragansett Electric Co. v. Burke,* \_\_\_ R.I. \_\_\_, 381 A.2d 1358 (1977), *cert. denied,* 435 U.S. 972 (1978); *In re Application of Wilmington Suburban Water Corp.,* 367 A.2d 1338 (Super Ct. Del. 1976); *Commonwealth v. Virginia Electric and Power Co.,* 211 Va. 758, 180 S.E.2d 675 (1971).

To calculate the rate of return, the costs of each component of capital — debt, preferred stock and common equity — are weighted according to the ratio each bears to the total capital structure of the company and the resultant figures are

added together to yield a sum which is the rate of return. *South Central Bell Telephone Co. v. Louisiana Public Service Commission,* 352 So.2d 964 (La. 1977), *cert. denied,* 98 S.Ct. 3103 (1978); *City of Evansville v. Southern Indiana Gas and Electric Co.,* _____ Ind. App. _____, 339 N.E.2d (1975).

The proper return to be accorded common equity is the most difficult and least exact calculation in the whole rate of return procedure since there is no contractual cost as in the case of debt or preferred stock. *South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra,* 352 So.2d at 964; *Narragansett Electric Co. v. Harsch, supra,* 117 R.I. at 425, 368 A.2d at 1211; Butler, *The Rate of Return in Texas — The Neglected Issue,* 28 Baylor L. Rev. 937 (1976). As the court pointed out in *South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra,* 352 So.2d at 973:

> Equity capital does not always pay dividends; all profits after fixed charges accrue to it and it must withstand all losses. The cost of such capital cannot be read or computed directly from the company's books. Its determination involves a judgment of what return on equity is necessary to enable the utility to attract enough equity capital to satisfy its service obligations.

The Commission adopted 13% as the return on equity which HELCO would achieve at an 8.95% rate of return and the Division argues that the 13% return to equity capital is not supported by the evidence.

The Commission agreed with HELCO that it could utilize HECO's cost of equity as its own cost of equity since HECO supplies all of the common equity for HELCO. The Division questions the propriety of using HECO's cost of equity capital to determine the adequacy of HELCO's rate of return. The Commission's adoption of HECO's cost of equity capital as HELCO's cost of equity capital is hardly unprecedented. HELCO, as we have stated earlier, is a wholly-owned subsidiary of HECO. HELCO, as a wholly-owned subsidiary, issues no stock to the public. Consequently, HELCO's cost of

equity is determined solely by HECO's cost of equity since a portion of each share of HECO's common stock represents an investment in HELCO. Use of the parent's capital structure has been criticized on the grounds that it fails to recognize, *inter alia,* that each subsidiary may experience significant differences in operating and financial risks. *South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra,* 352 So.2d at 971. Nevertheless, when a parent owns all or virtually all of a common stock of a subsidiary, the cost of equity to the subsidiary can only be reckoned on the basis of the cost of equity capital to the parent and most commissions have recognized this relationship between a corporate subsidiary and its parent. *Re United Telephone Co. of the West,* 12 P.U.R. 4th 462 (1975); *Re Southwestern Bell Telephone Co.,* 98 P.U.R. 3d 30 (1973); *Re Columbia Gas of Kentucky, Inc.,* 2 P.U.R. 4th 109 (1973); *Re Northern States Power Co.,* 3 P.U.R. 4th 388 (1973); *Re Columbia Gas of New York, Inc.,* 97 P.U.R. 3d 489 (1972).

In this case as is typical, to support the recommended 13% common equity return rate, HELCO's expert witness relied on comparable earnings studies which consisted of evidence showing the earnings rate of other companies. HELCO presented four exhibits containing information on the return on common equity for various companies. The first exhibit shows the average return on common equity earned by thirteen utilities during 1970-1974, which average ranged from 11.7% to 13.8%. The second exhibit lists the authorized average return on common equity (14.15%) for the same thirteen utilities. The third exhibit shows the average return on common equity (13.8%) authorized for twenty-four utilities in their most recent rate cases. Finally, the fourth exhibit provides the average return on common equity actually earned (14%) for 1200 companies representing nearly every business activity in the nation.

In short, HELCO relied on the language of the United States Supreme Court in *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 692 (1923), indicating that utilities should be permitted to earn rates

equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties.[2]

The Division argues that the exhibits, which represent HELCO's comparable earnings test, do not reflect reliable, probative and substantial evidence of HELCO's return on common equity because the companies are not comparable in risk and uncertainty with HELCO, but with HECO. However, as we have already decided that use of HECO's cost of common equity was not improper, we find no merit in the Division's contention. The Division further argues that, even assuming that use of HECO comparables is proper, the companies included in the four exhibits were not shown to have risks comparable to HECO. Despite the limitations of the comparable earnings test, these comparable earnings studies present useful information in assisting the Commission to arrive at an equity return cost. "[A] comparison of companies within a relatively wide range of risk with appropriate adjustments is proper. . . ." Leventhal, *Vitality of the Comparable Earnings Standard for Regulation of Utilities in a Growth Economy*, 74 Yale L.J. 989, 999 (1965). In some manner, every utility is unique and individual. No utility has a risk corresponding exactly to that of another. But comparisons between utilities provide an important method to arrive at a fair return on common equity. Therefore, imperfect but reasonable comparisons are permissible. *See Mechanic Falls Water Co. v. Public Utilities Commission, supra,* 381 A.2d at 1098.

The Division has failed to demonstrate that the Commission's authorization of an 8.95% rate of return was clearly erroneous. Basically, it overlooks the discretion conferred

---

[2] A more succinct formulation of the *Bluefield* standard appears in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944):

[T]he fixing of "just and reasonable" rates involves a balancing of the investor and the consumer interests. . . . [T]he return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

upon the Commission in determining a reasonable rate of return and the limited nature of our judicial review.

The standard for determining a fair rate of return appears to be deceptively simple and has been articulated by this court in *Honolulu Gas Co. v. Public Utilities Commission, supra*, 33 Haw. at 518-519, quoted in *In re Application of Kauai Electric Division, supra*, 60 Haw. at 190, 590 P.2d at 540. There we said that:

> There is no particular rate of compensation which must in all cases be regarded as fair earnings for capital invested in business enterprises. Locality, risks incurred and prevailing local rates on similar investments are all factors to be considered. Fair return is the percentage rate of earnings on the rate base allowed the utility after making provision for operating expenses, depreciation, taxes and other direct operating costs. . . . Fair return is something over and above the usual interest rate on well-secured loans to compensate for the risks and hazards of business and for the profits of management.

Questions concerning a fair rate of return are particularly vexing as the reasonableness of rates is not determined by a fixed formula but is a fact question requiring the exercise of sound discretion by the Commission. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944); *Mountain States Telephone and Telegraph Co. v. New Mexico State Corporation Commission*, 90 N.M. 325, 563 P.2d 588 (1977); *Mechanic Falls Water Co. v. Public Utilities Commission, supra*, 381 A.2d at 1098; *Mississippi Public Service Commission v. Mississippi Power Co.*, 337 So.2d 936 (Miss. 1976); *New England Telephone & Telegraph Co. v. State*, 113 N.H. 92, 302 A.2d 814 (1973). It is often recognized that the ratemaking function involves the making of "pragmatic" adjustments and that there is no single correct rate of return but that there is a "zone of reasonableness" within which the commission may exercise its judgment. *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission*, 345 F.Supp. 80 (D. Colorado 1972); *Commonwealth v. Virginia Electric and Power Co., supra*, 211 Va. at 769, 180 S.E.2d at 683-684; *Potomac Electric Power Co. v. Public Service Commission*,

380 A.2d 126 (D. C.Ct. App. 1977); *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission*, 186 Colo. 260, 527 P.2d 524 (1974). Thus, when a commission order is challenged, the only question on appeal is whether the decision meets the statutory requirement of HRS § 269-16 (1976) which is the basis for the commission's authority. As the United States Supreme Court concluded in the *Hope* case, *supra*, 320 U.S. at 602:

> Under the statutory standard of "just and reasonable" it is the result reached and not the method employed which is controlling. . . . It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust or unreasonable, judicial inquiry . . . is at an end.

Although HELCO presented evidence which supported a rate of return of at least 8.95% the Division presented no evidence to indicate a lower figure. Since the fair rate of return should cover the cost of capital, *see Honolulu Gas Co. v. Public Utilities Commission, supra*, 33 Haw. at 518-19, we cannot say that the Commission's determination of 8.95% as a fair rate of return was clearly erroneous.

B. Whether the burden of proof was impermissibly shifted in the proceeding before the commission.

The general rule is that in requesting rate increases, the burden of proof is on the utility to go forward with the evidence and justify its requested rate increases. *In re Application of Kauai Electric Division, supra*, 60 Haw. at 187, 590 P.2d at 538; *In re Application of Hawaiian Electric Co.*, 56 Haw. 260, 270, 535 P.2d 1102, 1109 (1975). HELCO based its application for rate increases on the 8.95% rate of return previously authorized in 1974 and characterized its application as a "make-whole"[3] proceeding in that it was seeking

---

[3] HELCO relies on *Southern Bell Telephone and Telegraph Co. v. Bevis*, 279 So.2d 285 (Fla. 1973) as permitting "make-whole" proceedings in which only limited proof is offered by the utility. We wish to point out, however, that *Southern Bell* involved a proceeding pursuant to emergency procedures. Since HELCO adduced evidence sufficent to justify the 8.95% rate of return previously authorized, we need not decide the possible due process problems inherent in a make-whole proceeding in which only limited proof is offered.

only limited relief to enable it to earn what it had been authorized to earn.[4]

On appeal, the Division argues that use of a previously authorized rate of return impermissibly shifted the burden of proof by creating a rebuttable presumption that the rate of return is reasonable and placed the burden on the Division to show substantive changes in condition to warrant a lower rate of return than previously authorized. Since a rate of return which is fair at one time may become unfair at a later time, there must be a finding by the Commission, supported by the record, that economic conditions have not changed to warrant a lower rate of return.

Our review of the record indicates that the Commission's finding that HELCO was still entitled to an 8.95% rate of return is supported by substantial evidence and that the burden of proof was not shifted. The Commission put the burden on HELCO to establish that it was still entitled to a return of 8.95% on its rate base; the same rate of return authorized in 1974. HELCO showed that its cost of capital had increased from 8.95% in 1973 to 9.32% at the end of 1974 because of increases in its embedded cost of debt and preferred stock. However, because it was requesting to be "made whole" it was using the same pro forma capital structure of 56% long term debt, 12% preferred stock and 32% common stock that was used in the docket in which the 8.95% rate of return was authorized although the actual capitalization was 54% long term debt, 6.8% preferred stock and 39.2% common stock. HELCO also emphasized that in order for it to sell first mortgage bonds and to continue to attract funds, it had to earn at least an 8.95% rate of return.

---

[4] HELCO's request to be allowed to earn its authorized rate of return is not unusual. With inflation, earnings are unable to keep pace with the increasing rate base so that, for many utilities, the authorized rate of return is never achieved. Increasingly, utilities have sought interim or emergency relief, pending a determination of final rates and subject to a refund of any excess. See *Friends of the Earth v. Public Service Commission*, 78 Wis. 2d 388, 254 N.W.2d 299 (1977). Generally, however, more than a mere revenue deficiency is necessary to warrant a temporary rate increase. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 217 Kan. 604, 538 P.2d 702 (1975).

While some of the language in the commission's order is unfortunate[5] we take it to mean only that HELCO met its burden of proving that use of the previously authorized 8.95% rate of return was justified.

## II. RESIDENTIAL RATE STRUCTURE[6]

In the proceeding below, the Commission found that HELCO's declining block residential rate structure was "just and reasonable" and authorized the rate schedule set out below:

| Charge | Cost per month |
|---|---|
| Customer Charge (regardless of the kwh of electricity used) | $3.50 |
| Energy Charge (to be added to the Customer Charge) | |
| first 100 kwh | 9.1¢ per kwh |
| next 200 kwh | 6.3¢ per kwh |
| next 300 kwh | 4.5¢ per kwh |
| all over 600 kwh | 5.0¢ per kwh |

On appeal, LK argues A) that Decision and Order No. 4123 and Order No. 4205 do not provide a sufficient statement of supporting facts and B) that there was no probative, reliable,

---

[5] In Decision and Order No. 4123 the Commission stated at p. 24:

First of all, it logically and legally follows that if the Company had not filed a request for a rate increase in January, 1975, it would still be entitled to an 8.95% return since that return was authorized in 1974. Since no docket was ever initiated to reduce rates or the rate of return, we assume that the 8.95% return would still be in effect today. By seeking further rate relief in January 1975, the parties maintain that the Company must again justify the return that was authorized in 1974 with facts to support the 8.95% return as being in accord with the test enumerated in the *Bluefield* and *Hope* cases, *supra*.

And the Commission further stated at p. 25 of that decision:

However, this Commission can take official notice of its decision that it had granted the Company a rate of return of 8.95% as being just and reasonable in May 1974.

[6] The reasonableness of the rate structures of the other customer classifications was not appealed.

substantial evidence on the record to support the discrimination in the residential rates approved by the Commission. We agree.

A. Whether Decision and Order No. 4123 and Order No. 4205 provide a sufficient statement of supporting facts.

In Decision and Order No. 4123 the Commission states that "[t]he new rate schedules . . . are just and reasonable" and supports its finding by nothing more than the recitation of certain general principles of rate design without facts to corroborate this finding or references to the record where such facts may be found.[7] The Decision and Order does, however, set out facts supporting the Commission's decision not to adopt LK's proposal presented by Dr. Frederick Wells.[8]

In Order No. 4205 denying LK's petition for reconsideration, the Commission again provides a detailed statement to support its denial of LK's proposed rate structure.[9] To sup-

---

[7] Thus the Commission states at p. 28 of its decision and order:

The HELCO witness testified (and the Division witness did not disagree) to the following important principles of rate design: the recognition of the load factor in allocating fixed costs between the energy and demand components; the necessity of a customer charge; the expense and impracticability of time-of-day metering for HELCO's system; the undesirability of establishing a lifeline rate at this time; the objections to the inverted rate structure (where the price per unit increases as the quantity of the service taken increases); the difficulty of measuring the price elasticity of electricity; encouragement of conservation of energy by rate design; and the general conclusion that the design of fair and reasonable rates is not a science and involves informed judgment based upon extensive knowledge and experience.

[8] See pp. 29-30 of the Commission's decision and order.

[9] In its Order 4205, the Commission stated at pp. 2-3:

The testimony revealed that Dr. Wells, from Washington D.C. knew almost nothing about the Island of Hawaii and very little of HELCO's system. At the time he testified he had not seen or inspected HELCO's system. Dr. Well [sic], by profession, was an economist and his central thesis on rate-making was to apply the theory of short-run marginal cost. This theory, he testified, could be applied to all utilities at all times and at all places without regard to the particular fact situation. . . . After emphasizing the importance of elasticity of demand, Dr. Wells could not indicate what role price elasticity would have in applying short-

port its decision to adopt, virtually unchanged, HELCO's proposed residential rate structure, the Commission sets forth the qualifications of the HELCO expert witness, suggests that the use of the declining block structure by other Hawaii utilities justifies its continued use, and states that the cost of service study was the basis for determining the residential as well as other customer schedules. The qualifications of the expert witness and the use of the declining block structure by other local utilities are not facts which support its conclusion that the rate structure was not unreasonably discriminatory. The cost of service study illustrates the relationship between the several customer classifications by comparing their respective rates of return. The study, while it aided in the determination whether there was undue discrimination between classifications, cannot determine whether there is undue discrimination within a customer category.

While we have said that the courts have great respect for the findings made by specialized agencies, those findings are subject to judicial review. In order to facilitate that review, HRS § 91-12 (1976) provides that:

> Every decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law. If any party to the proceeding has filed proposed findings of fact, the agency shall incorporate in its decision a ruling upon each proposed finding so presented.

The requirement that the Commission set out findings of fact and conclusions of law is no mere technical or perfunctory matter. *In re Application of Kauai Electric Division, supra,* 60 Haw. at 184, 590 P.2d at 537. The purpose of the statutory requirement that the agency set forth separately its

---

run marginal costs to rate making. In applying the short-run marginal costs, Dr. Wells also admitted that the range of error in his calculations with respect to these costs (average marginal cost, peak marginal cost) were 16⅔ to 22%. If the 22% factor were utilized, he confessed that it possibly could exceed the total increase HELCO was seeking in this case.

findings of fact and conclusions of law is to assure reasoned decision making by the agency and enable judicial review of agency decisions. *See In Re Application of Terminal Transportation, Inc.*, 54 Haw. 134, 504 P.2d 1214 (1972); Cooper, *supra*, at 465-468; Davis, *supra*, at § 16.03.

In order that we might be informed of the factual basis upon which the Commission relies, the Commission's findings of *ultimate* facts[10] must be supported by findings of *basic* facts which in turn are required to be supported by the evidence in the record. *In re Application of Kauai Electric Division, supra*, 60 Haw. at 184, 590 P.2d at 537; *Boise Water Corp. v. Idaho Public Utilities Commission, supra*, 97 Idaho at 840, 555 P.2d at 171; Cooper, *supra*, at 466; Davis, *supra*, at § 16.04. *See Mitchell v. BWK Joint Venture*, 57 Haw. 535, 560 P.2d 1292 (1977); *International Minerals and Chemical Corp. v. Mayo*, 336 So.2d 548 (Fla. 1976). In the instant case, the Commission has failed to support its ultimate finding that the residential rate structure is just and reasonable with sufficiently specific findings of fact to enable this court to intelligently review its decision. As the court said in *American Can Co. v. Davis*, 28 Or. App. 207, 216, 559 P.2d 898, 905 (1977):

> [T]he findings ought to set forth sufficient facts so that the reviewing court can prudently discharge its duty and not experience a sense of frustration through inability to get at the facts. The circumstance that the evidence is in the transcript and that the court, by weighing it, can determine for itself "the facts" does not suffice. The agency is the fact finder, and the undigested transcript is not a substitute for a set of findings of fact. . . . Nor should a court be put in a position wherein it is forced to ferret out the facts or seek them through engaging in mathematical calculations of a kind for which special training is required.

---

[10] An "ultimate" fact is usually cast in the statutory language. 2 Cooper, State Administrative Law 466 (1965).

We cannot fill the voids in the Commission's orders for we are not the fact finding body. *See Camelot Utilities, Inc. v. Illinois Commerce Commission*, 51 Ill. App. 3d 5, 365 N.E.2d 312 (1977); *New England Telephone and Telegraph Co. v. Public Utilities Commission*, _____ R.I. _____, 376 A.2d 1041 (1977); *City of Milford v. Illinois Commerce Commission*, supra, 45 Ill. App. 3d at 737, 359 N.E.2d at 1146; *American Can Co. v. Davis, supra*, 28 Or. App. at 216, 559 P.2d at 905; *Bristol County Water Co. v. Public Utilities Commission*, 117 R.I. 89, 363 A.2d 444 (1976). To hold otherwise would be inconsistent with the presumed validity of the Commission's orders.

B. Whether the Commission's conclusion that the residential rate structure is not unreasonably discriminatory is justified by reliable, probative and substantial evidence.

Once a utility's revenue requirement has been determined, the final question is the rate structure or the set of rates that will produce the additional revenues that are needed to earn the permitted rate of return. *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, _____ Minn. _____, 251 N.W.2d 350 (1977); *Cascade Natural Gas Corp. v. Davis*, 28 Or. App. 621, 560 P.2d 301 (1977).

Traditionally, electric utilities have used the "declining block" structure in which each classification of customers is divided into blocks of consumption so that as more units of electricity are consumed, the cost per unit decreases. HELCO's residential rate structure is not a true "declining block" structure as there is a slight rise in the tail block. However, the effect of HELCO's rate structure is the same in that the average cost per kilowatt hour declines as more kilowatt hours of electricity are consumed.[11]

---

[11] For example, the average cost of
100 kwh = 9.1¢ per kwh
300 kwh = 7.2¢ per kwh
600 kwh = 5.9¢ per kwh
1000 kwh = 5.5¢ per kwh

644

Historically, the prominent subjects in rate proceedings have concerned the revenue requirement — such as allowable expenses, rate base and rate of return. The question of rate design was largely left to the discretion of utility managements as it was felt that a utility would have no purpose in unfairly allocating among its various customers. *See*, Cudahy and Malko, *Electric Peak-Load Pricing: Madison Gas and Beyond*, 1976 Wis. L. Rev. 47; Kadane, *The Legality of Marginal Cost Pricing for Utility Services*, 5 Hofstra L. Rev. 755 (1977); Note, *Reform of Electricity Pricing in the United States*, 25 Buffalo L. Rev. 183 (1975).

The dramatic increase in rate design issues was the sudden turnaround in the early part of this decade of utility price increases rather than the historical experience of declining or stable utility prices. Real prices of coal, oil and natural gas have increased; the costs of constructing generating capacity has risen sharply; and legislation and regulation to mitigate the environmental impact of large power plants have added new costs that must be met. Federal Energy Administration, Electric Utility Rate Design Proposals: Interim Report (1977).

On appeal, LK alleges that the last three blocks of the declining block residential structure is unreasonably discriminatory because the price per kilowatt hour of electricity depends entirely on the level of use; that if that level is low, the customer is charged more per kilowatt hour than moderate and high volume users; and that the price discrimination works the greatest hardship on the poor. It concedes the presence in the record of substantial evidence to support the customer charge and the rate for the 0-100 kilowatt hour block. It contends that the last three blocks violate the law in that a rate schedule must be "just and reasonable, and prohibit . . . unreasonable discrimination between . . . consumers." HRS § 269-16(b) (1975 Supp.).

As we have stated earlier in this opinion, our function is not to substitute our judgment for that of the commissioners who are experts in the field of rate making, but rather to determine whether the record exhibits substantial factual differences to justify the differences among the rates per kilowatt hour charged the low, moderate and high volume

electricity users. It must be kept in mind that the presumption accorded a commission's order arises only upon compliance with the law and is not unassailable. *See Southwestern Bell Telephone Co. v. State*, 575 P.2d 624 (Okla. 1978); *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, 561 P.2d 779 (1977); *Burlington Out Now v. Burlington Northern, Inc.*, 96 Idaho 594, 532 P.2d 936 (1975). Further, while it is true that the burden of showing the impropriety of rates established by a regulatory agency lies with the party challenging the rates, *Southwestern Bell Telephone Co. v. State, supra*, 575 P.2d at 628; *State ex rel. Utilities Commission v. Edmisten*, 291 N.C. 424, 230 S.E.2d 647 (1976); *Louisiana Power & Light Co. v. Louisiana Public Service Commission, supra*, 343 So.2d at 1044; *Alabama Gas Corp. v. Wallace*, 293 Ala. 594, 308 So.2d 674 (1975), in this case, LK, that burden does not "require of impecunious associations or private citizens a quantification of evidence beyond their financial means to marshall." *American Public Power Association v. Federal Power Commission*, 522 F.2d 142, 147 (D.C. Cir. 1975) (concurring opinion of Judge Bazelon). The presumption of lawfulness and reasonableness of findings can be overcome by a showing that no evidence was presented to sustain the order. *Legislative Utility Consumers' Council v. Public Utilities Commission*, _____ N.H. _____, 383 A.2d 89 (1978); *Kanawha Valley Transportation Co. v. Public Service Commission*, _____ W.Va. _____, 219 S.E.2d 332 (1975); *State ex rel. Utilities Commission v. Edmisten, supra*, 291 N.C. at 428, 230 S.E.2d at 650; *Norfolk and Western Ry. Co. v. Commonwealth*, 215 Va. 214, 207 S.E.2d 883 (1974).

It is not any discrimination that is forbidden by the law but only those which are unreasonable. If it were otherwise, there would be only one rate for all customers, for every classification is in effect a discrimination.

Given this record, we cannot say that the declining block residential rate structure is unreasonable as a matter of law. We have determined, however, that there is no factual basis in the record for the present discrimination in the last three

blocks of the residential rate structure. HELCO's witness, Kenneth Stretch, testified that the decline in the 300-600 kilowatt hour block was justified by a higher load factor[12] of customers consuming electricity in this block. He testified before the Commission that:

> The lower use customers have low load factors and the higher use customers have higher load factors. For this reason in a block rate which is charged per kilowatt hour, a higher load factor would have a lower price and the lower load factor would have a higher price.

However, Mr. Stretch's testimony was not based on any evidence in the record and there is no evidence which would justify such a conclusion. The Commission states in Order No. 4205 at p. 6 that:

> Whether the load factor for each residential block was or can be quantified with a great degree of specificity is not relevant or material to the question of adoption of HELCO's rate structure. No utility in the United States that we know of has been able to specifically quantify the load factor for each residential block. The Commission's ruling reflects this reality and that quantification of load factor for each block is not material to the adoption of the rate structure in this case.

If the load factor is given as the justification for different rates within the residential rate schedule, then the load factor for each block would have to be quantified. *See Re Madison Gas and Electric Co.*, 5 P.U.R. 4th 28 (1974). Mr. Stretch emphasized that the load factor for HELCO as a whole improved from 56.6% in 1970, to 60.5% in 1973 and to 61.5% in 1974. This fact, however, sheds no light on the reasonableness of the three kilowatt hour blocks at issue.

In the absence of any justification for the last three kilowatt hour blocks, HELCO's residential rate structure will stand as a declining block structure which only promotes the

---

[12] A load factor is defined as the ratio of average load in kilowatt hours during a designated period to peak-load in kilowatts during that period. A higher load factor indicates a higher utilization of capacity.

use of electricity.[13] Unquestionably, a rate schedule that serves only to promote greater consumption of electricity would be contrary to our state and national public policy. *See In re Application of Hawaiian Electric Co.*, 56 Haw. 260, 535 P.2d 1102 (1975); Energy Conservation and Production Act, Pub. L. 94-385 (1976). In the past, promoting the consumption of electricity by encouraging the sale of water heaters and basing rates on a sliding scale was systematically upheld against charges of undue or unreasonable discrimination. *See Rossi v. Garton,* 88 N.J. Super. 233, 211 A.2d 806 (1965); *Bilton Machine Tool Co. v. United Illuminating Co.*, 110 Conn. 417, 148 A. 337 (1930). Increasingly, however, regulatory commissions have found that promotional rates should be discarded or modified when they have outlived their usefulness in view of public policy objectives in the areas of conservation of natural resources and protection of the environment. *Re The Cleveland Electric Illuminating Co.*, 3 P.U.R. 4th 259 (1973); *Re Idaho Power Co.*, 86 P.U.R. 3d 458 (1970).

In addition to conservation of energy and optimization of the efficient use of facilities and resources, a public utility's rate structure should encourage equitable rates to all its consumers including the poor and the elderly. Reactions to demands that the increasing energy burden borne by the poor and the elderly be alleviated range from sympathy to scorn for "social rate making." Our laws, however, recognize that the poor and the elderly are deserving of special protection. *See, e.g.,* HRS § 346-52 (aged and needy eligible for public assistance); § 346-71 (general assistance available to needy persons); § 359-51 *et. seq.* (housing for elderly persons); § 431-522 to 431-529 (extended health insurance for elderly).

There has always been a great measure of public policy that enters into the designing of rates. It is incumbent upon the Commission to make public policy decisions and to

---

[13] The electric water heater block was instituted in 1970 in Docket No. 1826 to encourage the use of electricity to improve the company's load factor.

change proposed rates that do not comport therewith.[14] Other Commissions have recognized the inappropriateness of the declining block structure and have begun to gradually modify rate differentials favoring large volume users although, for the most part, they have not eliminated the declining block feature in one fell swoop. *See General Motors Corp. v. Public Utilities Commission*, 47 Ohio St.2d 58, 351 N.E.2d 183 (1976); *Cleveland Electric Illuminating Co. v. Public Utilities Commission*, 42 Ohio St. 2d 403, 330 N.E.2d 1 (1975) (ordered reduction in proposals for minimum bills and initial energy block); *Re Arkansas Western Gas Co.*, 16 P.U.R.4th 103 (1976); *Re Cut Bank Gas Co.*, 12 P.U.R. 4th 106 (1975) (denied utility's proposal for declining block structure); *Re Consumers Power Co.*, 3 P.U.R. 4th 321 (1974) (flat rates); *Re Public Service Co.*, 9 P.U.R. 4th 224 (1975); *Re Madison Gas and Electric Co.*, *supra*, 5 P.U.R. 4th 28; *Re Detroit Edison Co.*, 2 P.U.R. 4th 188 (1973). Redesigning rates to meet the policy considerations hereinbefore stated can be accomplished by placing a heavier burden on larger users than on smaller users. *Re Carolina Power and Light Co.*, 8 P.U.R. 4th 449 (1975); *Application of Arkansas Louisiana Gas Co.*, 558 P.2d 376 (Okla. 1976); *Re Public Service Co.*, *supra*, 9 P.U.R. 4th at 230. While rate fixing need not be controlled exclusively by precise cost allocation[15] it is not enough to discriminate within the residential rate schedule, as HELCO does, without a rational basis.

For the foregoing reasons, we affirm as to the first issue on the reasonableness of the 8.95% rate of return on HELCO's rate base; but remand with respect to the second issue on the

---

[14] The Commission, on its own motion, has instituted Docket 2793, Order No. 4124 "to investigate various electric and gas rate structures and [to determine] what changes, if any, should be made in presently constituted electric and gas rate structures.

[15] There is no authority that utility rates must be based solely on cost factors. *International Minerals and Chemical Corp. v. Mayo*, 336 So.2d 548 (Fla. 1976); *Apartment House Council v. Public Service Commission*, 332 A.2d 53 (D.C. Ct. App. 1975); *Central Maine Power Co. v. Public Utilities Commission*, 382 A.2d 302 (Me. 1978).

reasonableness of the declining block residential rate structure with directions that the Commission hold further proceedings and make the necessary findings of fact and conclusions of law in accordance with part II of this opinion. In the interim pending the outcome of the Commission's further consideration of the reasonableness of the residential rate structure, the declining block structure is to be maintained. Should the Commission be unable to determine the reasonableness of the declining block residential rate structure and find that it is unreasonably discriminatory in that one or more classes have been and continue to be unreasonably burdened and one or more classes unjustly enriched, it shall order prospectively, to the respective classes, the necessary adjustments to the rates to be billed in the future. The revenue requirement is to remain the same and is not to be affected. The amounts to be prospectively refunded or surcharged, calculated from the effective date of the rates approved in Decision and Order No. 4123, can be determined by comparing the amounts paid by the residential customer classes under the declining block rate structure with what they would have paid under the new structure developed by the Commission.

*Barry M . Utsumi*, Deputy Attorney General, for Appellant Public Utilities Division, Department of Regulatory Agencies, State of Hawaii.

*Dennis Niles* (Legal Aid Society of Hawaii of counsel) for *Lima Kokua*, Appellant-Intervenor.

*David L . Fairbanks (Goodsill, Anderson & Quinn* of counsel) for Appellee.