**Electronically Filed
Supreme Court
SCWC-20-0000172
15-SEP-2025
12:35 PM
Dkt. 21 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

CARRIE N. NOBORIKAWA,
Petitioner/Claimant-Appellant-Appellant,

vs.

HOST INTERNATIONAL, INC.,
Respondent/Employer-Appellee-Appellee,

and

ACE INSURANCE CO., adjusted by Corvel Corporation,
Respondent/Insurance Carrier-Appellee-Appellee.

SCWC-20-0000172

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-20-0000172; CASE NO. AB 2018-009)

SEPTEMBER 15, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY EDDINS, J.

This case involves a workers' compensation partial

permanent disability (PPD) award for a 2007 bilateral knee

injury.

Carrie Noborikawa was an airport restaurant and bar manager for Host International, Inc. In March 2007, Noborikawa injured both knees at work while lifting a beer keg into a walk-in refrigerator. Her right knee required surgery a few months later. After finishing physical therapy, she experienced recurring symptoms such as pain, swelling, buckling, and fluid buildup in her right knee.

While her left knee had fewer symptoms, she experienced pain and crunching in that knee. She took pain medication daily, had difficulty sleeping, and couldn't engage in many of her hobbies, such as golfing, hiking, and volunteering at her children's school.

Noborikawa was unable to return full-time to her managerial position. Host International eventually fired her in 2012 for exceeding their leave policy. In 2013, she underwent two different functional capacity evaluations. The evaluations showed that she was only capable of sedentary work. After completing vocational rehabilitation, she found employment in January 2016 working as a medical coder and biller. Since then, she has worked in that field.

Noborikawa filed for workers' compensation. In 2010, 2013, and 2016, Dr. James Langworthy evaluated Noborikawa to set impairment ratings for both knees. (Dr. Langworthy's impairment rating was based on the AMA Guides to the Evaluation of

Permanent Impairment and examined the knees' ranges of motion.) The doctor determined that her right knee was 5% impaired, and that her left knee was 0% impaired. This permanent impairment rating was part of the basis for her PPD award, or compensation for the loss of physical functioning. See Ihara v. State of Hawai'i, Dep't of Land & Nat. Res., 141 Hawai'i 36, 42, 404 P.3d 302, 308 (2017).

Pursuant to a hearing, the Department of Labor and Industrial Relations Disability Compensation Division (DCD) awarded Noborikawa 7% PPD for the right knee and 0% for the left knee. It ordered Host International to pay a total PPD award of $13,668.48.

Noborikawa appealed to the Labor and Industrial Relations Appeals Board (LIRAB). Because she was permanently disabled from her job as a restaurant and bar manager and could only handle sedentary work, Noborikawa argued she should have received 20% for her right knee and 7% for her left knee. Host International argued that Dr. Langworthy's rating governed, and that Noborikawa failed to meet her burden of proving entitlement beyond the extra 2% the DCD added to Dr. Langworthy's 5% right knee rating.

The LIRAB majority awarded 8% PPD for Noborikawa's right knee, and 3% PPD for her left knee. It bumped Dr. Langworthy's rating by 3% in both knees.

LIRAB's chair dissented, concluding that he would have awarded 20% PPD for the right knee and 5% PPD for the left knee.

The Intermediate Court of Appeals (ICA) affirmed LIRAB's majority decision and order.

We disagree.

First, LIRAB does not provide sufficient findings of fact, analysis, or conclusions of law to show an appellate court how it reached its PPD award determination. Kauai Springs, Inc. v. Planning Comm'n of Cnty. of Kaua'i, 133 Hawai'i 141, 164, 324 P.3d 951, 974 (2014). While this court defers to LIRAB's expertise in determining the degree of an injured worker's PPD, agencies must provide sufficient findings to "allow the reviewing court to track the steps by which the agency reached its decision." See id.; Ihara, 141 Hawai'i at 47, 404 P.3d at 313.

The LIRAB Chair's comparatively detailed dissent shows why LIRAB's decision is insufficient. See Kauai Springs, 133 Hawai'i at 164, 324 P.3d at 974. We are persuaded by the dissent's reasoning, and award 20% for the right knee and 5% for the left knee.

Second, the ICA did not err in holding that LIRAB considered Noborikawa's permanent disability from her Host International job. Because an injured worker's inability to return to their pre-injury job is a discretionary factor, LIRAB

4

did not err in not explicitly analyzing Noborikawa's ability to return to her Host International job. See Ihara, 141 Hawai'i at 47, 404 P.3d at 313. Thus, LIRAB's reference to Noborikawa's inability to return to her prior job in its findings, but not in its analysis, was proper. See id.

Last, we hold that LIRAB erroneously relied on Noborikawa's successful vocational rehabilitation and TTD benefits in determining her PPD award. LIRAB improperly conflated wage-based TTD benefits with physical impairment-focused PPD awards.

Thus, we vacate the ICA's judgment and vacate in part LIRAB's decision and order.

## I.

Before her injury, Noborikawa had worked for Host International at the Honolulu airport as a Stinger Ray's Bar & Grill manager for just over 13 years. Her duties included food delivery, bussing tables, and assisting in the kitchen, bar, and back of house. She also trained and supervised other Host International staff.

On March 9, 2007, Noborikawa lifted a beer keg from a flatbed roller and placed it into a walk-in refrigerator. She suffered a bilateral knee injury. Noborikawa explained that she lifted the beer keg, turned, and felt her knee pop. She "shook off the pain" and finished her busy day. When she got home, she

saw black and blue rings around both knees and "it hurt like crazy."

Host International accepted liability for the injury through its WC-1 Employer's Report of Industrial Injury.

Starting in March 2007, family and sports medicine doctor Dr. Blane Chong treated Noborikawa. He aspirated (removed liquid from) both knees multiple times, injected both knees with Supartz and Kenalog, prescribed pain medication, and referred Noborikawa to physical therapy. She started physical therapy on March 28, 2007.

In June 2007, orthopedic surgeon Dr. Calvin Oishi completed surgery on her right knee.

On March 3, 2010, Dr. Chong assessed Noborikawa's functional capacity. He opined that Noborikawa could "never" carry or lift more than ten pounds, nor squat, crawl, climb, or reach above the shoulder. He added that she could only "occasionally" bend or push and pull items while seated or standing. The doctor qualified her for "sedentary work."

In September 2013, CHART Rehabilitation determined that Noborikawa was classified for "sedentary-light" work.

For workers' compensation purposes, Dr. Langworthy examined Noborikawa three times over six years to determine permanent impairment ratings for both knees. In July 2010, Dr. Langworthy determined that Noborikawa's medical condition had stabilized,

so he could assess her condition.  Using the 5th Edition of the AMA Guides to the Evaluation of Permanent Impairment (AMA Guides), Dr. Langworthy determined Noborikawa had a 5% permanent impairment of the right lower extremity, and no impairment of the left lower extremity.

Three years later, Dr. Langworthy made the same determination after a follow-up assessment.  He noted that "her symptoms are staying the same," and that "there is no change in the rating after today's evaluation."  In 2016, Dr. Langworthy found that Noborikawa's "symptoms and exam findings [were] very similar to what [he] had seen in the past."  He again reported Noborikawa's impairment as 5% for the right knee.  He did not report any left knee impairment.

Three months after her 2007 knee surgery, Noborikawa returned to work on light duty (working about three days per week, four hours per shift).  Host International fired Noborikawa in 2012 for exceeding their leave of absence policy.

A vocational rehabilitation program assessed Noborikawa's skill set and recommended that she train to work as a medical coder and biller.  She did.  Noborikawa attended Hawai'i Medical College and became a certified biller.  She worked forty hours a week as a medical biller for an urgent care center from January 6, 2016 until July 2018.  She later went to work as an independent contractor in that field.

After a DCD claims hearing, in December 2017, the Director of the Department of Labor and Industrial Relations found 7% PPD of the "right leg" based on Dr. Langworthy's report and Noborikawa's testimony.  The Director found no permanent disability of the "left leg" based on Dr. Langworthy's report.  The Director ordered Host International to pay: (1) one $125.00 lump sum disfigurement payment for right knee hyperpigmented scarring, (2) $180,714.48 for temporary total disability (TTD) for select date ranges between June 2007 and January 2016, and (3) $22,997.50 for temporary partial disability (TPD) for select date ranges from September 2007 through February 2010.  Host International was also ordered to pay $13,668.48 for PPD of her right leg ($540.83 weekly compensation for 25.27 weeks at 7% PPD).

In January 2018, Noborikawa appealed to LIRAB.  She appealed the denial of PPD benefits for the left knee and the 7% PPD award for the right knee.  She did not appeal the other payments.

In February 2019, LIRAB held an agency hearing.  See Hawai'i Administrative Rules (HAR) § 12-47-2 (per the LIRAB rules of practice and procedure, "trial" means an "agency hearing" as defined in Hawai'i Revised Statutes (HRS) § 91-1(6) (1993)).  Noborikawa was the only witness.  Noborikawa testified regarding her post-surgery condition.  She said she returned to work part-

8

time after surgery, but continued to experience pain, throbbing, swelling, and buckling in her right knee.  Sometimes she used a cane.

Noborikawa explained that she experiences stiffness and achiness in her right knee.  She sleeps with pillows under her knees, a fan blowing on her knees, and experiences a pain level of about three every morning until her knees "warm up."  She can't sit for extended periods, gets up at least once an hour, must be careful how she positions her legs, and cannot sit in chairs that lack support.  In her new job as a medical coder, she gets up more often to walk around than others.  Towards the end of the day, she related, her right knee is swollen and hot, and looks like a mushroom.

Noborikawa testified that her left knee has slightly different symptoms.  She experiences less swelling, but notices occasional crackling and crunching sounds.  But if she "do[es] something wrong," her left knee swells.  She described her condition as a "precarious situation."

Last, Noborikawa testified as to how her injury impacted her home life.  Noborikawa testified that she takes Advil for pain almost daily, 300 milligrams of Lyrica (nerve pain medication) in the evening, and 100 milligrams of Lyrica in the afternoon as needed.  She said she used to be able to leg press 235 pounds, but that she now can only leg press 37 pounds.

Noborikawa also testified that she is no longer able to clean her house in one session like she used to, but instead cleans in segments over several days.  Before her injury, she enjoyed furniture reupholstering, golfing three to four times per week, construction projects with her father, and volunteer work teaching painting at a school.  Now, she's cautious about participating in her hobbies to avoid her "body pay[ing] for it later."

In its decision and order, LIRAB awarded 8% PPD for Noborikawa's right knee, and 3% PPD for her left knee.

LIRAB made several findings.  In 2010, Dr. Langworthy evaluated Noborikawa's right knee at 5% PPD and left knee at 0% PPD, given her "minor complaints and normal examination of the left knee."  The doctor's 2013 evaluations referenced cortisone injections to the right knee and occasional swelling and buckling in the left knee, LIRAB found.  During that examination, Noborikawa described how the injury affected her ability to perform her activities of daily living and that she continued to experience knee pain, swelling, and catching.  In 2013, LIRAB found, Noborikawa underwent a functional capacity evaluation deeming her capable of sedentary work.  She was unable to return to her usual and customary job as a restaurant and bar manager.

Noborikawa completed vocational rehabilitation and attended Hawaiʻi Medical College to train as a medical coder-biller. She found work in January 2016 as a medical coder-biller.

Dr. Langworthy re-evaluated Noborikawa in September 2016. He noted that Noborikawa reported no changes in her symptoms. He again rated her right knee at 5% and provided no rating for the left knee.

Next, LIRAB detailed Noborikawa's testimony. She "testified about her symptoms in her right and left knees." For her right knee, Noborikawa explained that she feels pain in the morning and throughout the day, and that her knee gets swollen and hot by the end of the day. She reported she cannot sit for long, needs to get up every hour or so, and cannot tuck her legs under chairs. She sleeps with four pillows between or under her knees and slowly gets up from certain positions.

Regarding her left knee, Noborikawa testified that she experienced weakness and achiness, and crunching or cracking sounds. If she were to do something out of the ordinary, she would feel a sharp pain that would take a couple of days to resolve on its own. She testified that her left knee does not swell up as much as the right knee, but it would "if she did something wrong."

LIRAB found that Noborikawa was unable to return to her usual and customary job because of her work injury to both

knees. After completing vocational rehabilitation, LIRAB noted that Noborikawa attended classes to train as a medical coder or biller, and found suitable employment in that field in January 2016. LIRAB found that Dr. Langworthy rated Noboroikawa's right lower extremity impairment as 5% and her left lower extremity as 0% based on the AMA Guides. LIRAB credited Noborikawa's testimony regarding recurrent symptoms in her right knee and recurrent and intermittent symptoms in her left knee, and how they impacted her daily home and work activities.

LIRAB said that it considered Dr. Langworthy's impairment ratings, Noborikawa's inability to return to her usual and customary job, the impact of the injury on Noborikawa's work in her new job, and her residual symptoms. It found that Noborikawa argued she was 100% disabled from her usual and customary job, but "presented no evidence to meet her burden of proving [her] entitlement to an award of 20% PPD for the right leg and 7% PPD for the left leg." Thus, LIRAB concluded, Noborikawa sustained 8% permanent impairment to the right lower extremity and 3% permanent impairment to the left lower extremity.

LIRAB Chair Danny Vasconcellos concurred with the majority to reverse and modify the DCD Director's December 2017 decision. But he dissented as to the majority's PPD percentage awards. He

would've awarded 20% PPD for the right knee and 5% PPD for the left knee.

The Chair stated that his assessment of Noborikawa's inability to perform her usual and customary job was informed by (1) Dr. Blane Chong's March 3, 2010 functional capacity evaluation (FCE), (2) a September 20, 2013 CHART Rehabilitation FCE qualifying Noborikawa for sedentary work, (3) Vocational Rehabilitation Services' placement of Noborikawa in sedentary work as a medical biller and coder because of her inability to function in her prior restaurant manager job, and (4) Noborikawa's testimony regarding how recurrent symptoms in her right and left knees impact her daily home and work activities. Thus, the Chair determined that "there is reliable, credible and persuasive evidence to support my finding that [Noborikawa] sustained permanent impairment of 20% of the right lower extremity and 5% of the left lower extremity."

The Chair first stated that Noborikawa's "true total loss of impairment" rating was based on Dr. Chong's verification of her inability to function as a restaurant and bar manager, limiting Noborikawa to sedentary work. Second, vocational rehabilitation records detail how Noborikawa underwent three surgeries, then attended school for eventual placement as a certified medical biller and coder. Third, he assessed Dr. Langworthy's impairment ratings, which were based exclusively on

the AMA Guides. Last, he credited Noborikawa's testimony regarding limitations to both legs and the right leg injury's impact on her daily living and work life (including her inability to work in six of eight FCE work categories). The Chair concluded that in analyzing "other factors affecting a PPD determination" beyond Dr. Langworthy's impairment ratings, Noborikawa presented substantial, credible, and persuasive evidence for the Board to award 20% PPD for the right knee and 5% PPD for the left knee. See Ihara, 141 Hawai'i at 44, 404 P.3d at 310.

Noborikawa appealed the majority's 8% award for the right knee and 3% for the left knee.

Before the ICA, Noborikawa argued that LIRAB failed to consider her permanent disability preventing her from returning to her former restaurant and bar manager duties. She claimed that LIRAB failed to sufficiently explain the basis for its awards of 8% and 3% "to a person who was 100% disabled from her job," and failed to make findings sufficient to allow the court to understand how LIRAB reached its decision. Noborikawa also maintained that LIRAB erroneously relied on her vocational rehabilitation, re-employment as a coder, and her receipt of TTD benefits to award her a lower PPD.

The ICA affirmed LIRAB's decision. It held that LIRAB sufficiently explained its PPD award, and considered

14

Noborikawa's inability to return to work with Host International. It also held that LIRAB did not erroneously treat PPD benefits as TTD benefits, but rather "accurately informed [Noborikawa] that she was not entitled to greater PPD benefits solely due to her inability to return to work, and that there were other benefits such as TTD for the inability to return to work with [Host International]."

Noborikawa applied for cert. We accepted.

She argues that LIRAB (1) failed to consider her permanent disability from her Host International bar manager job, (2) failed to sufficiently explain how it reached its PPD award, and (3) improperly used her successful vocational rehabilitation to justify a "meager PPD award."

We hold that LIRAB did not provide "reasonably clear" findings of fact or conclusions of law to allow this court to track how it reached its PPD award decision. We vacate the ICA's decision, affirm the LIRAB dissent's traceable reasoning, and award Noborikawa 20% PPD for the right knee and 5% PPD for the left knee.

## II.

### A. LIRAB does not provide "reasonably clear" findings of fact or conclusions of law to allow this court to track how it reached its PPD award decision

We reverse the ICA's decision that "LIRAB sufficiently explained how it reached its PPD award." The LIRAB majority's

15

"Findings of Fact, Analysis/Discussion, and Conclusions of Law" do not clearly illustrate how it came to its PPD award decision. Based on the record, we conclude that the LIRAB majority's 8% and 3% awards for the right and left knees were clearly erroneous. See HRS § 91-14(g) (1993 & Supp. 2004). Because the LIRAB dissent allows this court to track its reasoning and the record supports its conclusion, we hold that Noborikawa is entitled to 20% PPD for the right knee and 5% PPD for the left knee.

Per HRS § 91-12 (1993), "[e]very decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law." See Application of Hawai'i Elec. Light Co., Inc. (HELCO), 60 Haw. 625, 641-42, 594 P.2d 612, 623-24 (1979) (quoting HRS § 91-12). The purpose of HRS § 91-12, is "to assure reasoned decision making by the agency and enable judicial review of agency decisions." Id. at 641-42, 594 P.2d at 623. "A court reviewing the decision of an agency should ensure that the 'agency . . . make its findings reasonably clear. The parties and the court should not be left to guess . . . the precise finding of the agency.'" Matter of Hawai'i Elec. Light Co., Inc., 145 Hawai'i 1, 11, 445 P.3d 673, 683 (2019). Thus, "[a]n agency's findings should be 'sufficient

16

to allow the reviewing court to track the steps by which the agency reached its decision.'" Kauai Springs, 133 Hawai'i at 164, 324 P.3d at 974.

Court should not have to guess. "[Agency] findings ought to set forth sufficient facts so that the reviewing court can prudently discharge its duty and not experience a sense of frustration through inability to get at the facts." HELCO, 60 Haw. at 642, 594 P.2d at 623.

HELCO held that the Public Utility Commission's decision approving a rate schedule lacked a statement of supporting facts or references to the record where such facts may be found. Id. at 642, 594 P.2d at 623-24. This court held,

> The agency is the fact finder, and the undigested transcript [for example] is not a substitute for a set of findings of fact. . . . Nor should a court be put in a position wherein it is forced to ferret out the facts or seek them through engaging in mathematical calculations of a kind for which special training is required.

Id. (quoting American Can Co. v. Davis, 559 P.2d 898, 905 (Or. Ct. App. 1977)) (emphasis added). Because appellate courts are "not the fact finding body," we declined to "fill the voids in the Commission's orders." Id. at 643, 594 P.2d at 624.

Here, in contrast to the dissent's opinion, LIRAB did not specify which findings of fact led to its percentage award of 8% for the right knee and 3% for the left knee. LIRAB generally set forth information it considered in making its decision, such as Dr. Langworthy's reports and Noborikawa's testimony. But it

17

did not specify the information it relied on to increase the award from 7% to 8% for the right knee and from 0% to 3% for the left knee. It also failed to indicate what evidence it discarded in denying Noborikawa's request for 20% for the right knee and 7% for the left knee.

LIRAB found that Noborikawa could not return to her usual and customary job because of her work injury to both knees. After completing vocational rehabilitation, Noborikawa attended classes to train as a medical coder or biller, and found suitable gainful employment in that field. LIRAB found that Dr. Langworthy rated Noboroikawa's right lower extremity impairment as 5% and her left lower extremity as 0% based on the AMA Guides. It credited Noborikawa's testimony regarding recurrent symptoms in her right knee and recurrent and intermittent symptoms in her left knee, and how they impacted her daily life activities.

LIRAB found that Noborikawa "suffered a loss of physical function of both the right and left legs, as result of the work-related bilateral knee injury." FOF 8 reads:

> 8. In evaluating [Noborikawa's] PPD for the right and left lower extremities, the Board considered the impairment ratings by Dr. Langworthy based on the AMA Guides, [Noborikawa's] post-injury inability to return to her usual and customary job, the impact of the injury on [her] work in her new job, and her residual symptoms.

In FOF 9, LIRAB found that while Noborikawa argued she was "100% disabled from her usual and customary job," she "presented

no evidence to meet her burden of proving [her] entitlement to an award of 20% PPD for the right leg and 7% PPD for the left leg." (emphasis added); see Skahan v. Stutts Constr. Co., Inc., 148 Hawai'i 460, 468, 478 P.3d 285, 293 (2021).

LIRAB explained in its Analysis/Discussion:

> In assessing [Noborikawa's] impairment, the Board has considered not only Dr. Langworthy's impairment ratings, but also [Noborikawa's] testimony and documented reports regarding her symptoms in the right and left lower extremities, [her] ability to return to her bar and restaurant manager job, the injury's impact on the job she has been rehabilitated into, and any other factors that affect PPD assessment pursuant to Ihara.

Last, in its Conclusions of Law, LIRAB determined that Noborikawa was entitled to 8% PPD for the right knee and 3% PPD for the left knee.  It presented no other conclusions of law.

LIRAB's slim recitation of facts and general statement that it reviewed the record, absent more detailed FOFs and COLs, is insufficient for a reviewing court to determine how LIRAB came to its PPD award.  See Kauai Springs, 133 Hawai'i at 164, 324 P.3d at 974.  LIRAB has discretion to determine the PPD award. Ihara, 141 Hawai'i at 45, 404 P.3d at 311 ("Where a physician's estimate of the permanent impairment under the AMA Guides is zero, [LIRAB] nonetheless has the discretion to find a determinate degree of impairment using standards not encompassed by the AMA Guides.").  But this discretion must be traceable. See Kauai Springs, 133 Hawai'i at 164, 324 P.3d at 974.  LIRAB's analysis essentially says that it has discretion to determine

19

PPD awards, so, based on its review of the record, it exercised that discretion and made a PPD award.

LIRAB's conclusions of law do not apply law to facts, and merely state a percentage award for each knee.  LIRAB's decision and order thus asks us to make a major analytical leap from its fact recitation to its seemingly untethered final award percentages.  See HELCO, 60 Haw. at 643, 594 P.2d at 624.

We hold that LIRAB's conclusory decision is insufficient.

The LIRAB majority's reasoning also includes discrepancies that muddy our tracking of its factual and legal analysis.  See Kauai Springs, 133 Hawai'i at 164, 324 P.3d at 974.  LIRAB mentioned in FOFs 5 and 6 that it credited Noborikawa's testimony regarding recurrent symptoms in her right knee, intermittent and recurrent symptoms in her left knee, and how both knees "impacted her daily activities at home and at work." Indeed, Noborikawa testified during the LIRAB hearing to symptoms that last all day at varying pain levels, and impact her current work, home life, and hobbies.  LIRAB also said in FOF 8 that, among other evidence, it considered Noborikawa's "residual symptoms."

But LIRAB then determined that Noborikawa "present[s] no evidence" to meet her burden of proof in establishing 20% and 7% entitlement for the right and left knees.  (Emphasis added.) Because LIRAB credited Noborikawa's testimony about major

lifestyle impacts, its subsequent determination that she offered "no evidence" to support a 20% and 7% entitlement is clearly erroneous. See Skahan, 148 Hawai'i at 468, 478 P.3d at 293 (finding of fact that there was "no evidence" employee's back injury was work-related clearly erroneous because doctor's report stated the back injury was related to the incident).

It is unclear to us why, if Noborikawa submitted "no evidence" supporting a higher entitlement, LIRAB chose to award 1% more for the right knee and 3% more for the left knee than DCD did. Further, in crediting Noborikawa's testimony that she can no longer leg press hundreds of pounds, experiences daily pain, and is severely limited in participation in her hobbies, LIRAB's 8% and 3% award is clearly erroneous. See HRS § 91-14(g); Skahan, 148 Hawai'i at 468, 478 P.3d at 293.

Generally, reviewing courts defer to LIRAB's expertise in determining the degree of an injured worker's permanent partial disability. See Ihara, 141 Hawai'i at 47, 404 P.3d at 313 (citing In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)). This presumption of validity for agency decisions, though, "'presupposes that the agency has grounded its decision in reasonably clear' findings of fact and conclusions of law." Matter of Hawai'i Elec. Light Co., 145 Hawai'i at 11, 445 P.3d at 683 (citing In re Wai'ola O Moloka'i,

21

Inc., 103 Hawai‘i 401, 432, 83 P.3d 664, 695 (2004)). Thus, absent traceable findings and conclusions of law, we do not need to defer to LIRAB's decision. See id.

**B.    The LIRAB Chair's dissent allows this court to track how he reached his PPD award decision**

The LIRAB Chair's dissent, unlike the majority decision, allows this court to trace the Chair's reasoning. See Kauai Springs, 133 Hawai‘i at 164, 324 P.3d at 974. Thus, we are persuaded by the Chair's analysis and hold that Noborikawa is entitled to 20% PPD for the right knee and 5% PPD for the left knee.

First, the Chair more clearly delineated the evidence he relied on in making his decision. He explained that he based his 20% right knee and 7% left knee PPD awards on (1) Dr. Blane Chong's March 3, 2010 functional capacity evaluation (FCE), (2) a September 20, 2013 CHART Rehabilitation FCE qualifying Noborikawa for sedentary work, (3) Vocational Rehabilitation Services' placement of Noborikawa in sedentary work as a medical biller and coder based on her inability to function in her prior restaurant manager job, and (4) Noborikawa's testimony regarding how recurrent symptoms in her right and left knees impact her daily home and work activities.

The LIRAB majority, on the other hand, was less equivocal. In its findings, it referenced Dr. Langworthy's three reports,

and a September 20, 2013 functional capacity evaluation deeming Noborikawa capable of sedentary work.  While LIRAB stated in its Analysis/Discussion section that it considered "not only Dr. Langworthy's impairment ratings, but also [Noborikawa's] testimony and documented reports regarding her symptoms in the right and left lower extremities," it did not specify whether it relied on any reports beyond those discussed in its findings.

The majority's analysis describes an evidentiary category on the record ("documented reports regarding [Noborikawa's] symptoms") but does not specify the specific type of reports it relied on.  For example, "documented reports regarding her symptoms" could refer to a (non-medical professional) vocational rehabilitation specialist's documentation of Noborikawa's self-reported condition.  It could refer to sports and rehabilitation specialist Dr. Blane Chong's (1) functional assessments, (2) ongoing treatment plans, or (3) full condition and pain reports. Or it could also refer to occupational practitioner Dr. Vern Sasaki's 2009 Independent Medical Examiner PPD determination, or CHART Rehabilitation's September 30, 2013 functional capacity assessment.

Here, because LIRAB's FOFs and Discussion/Analysis only reference Dr. Langworthy's reports and the September 30, 2013 functional capacity evaluation, it is unclear which other "documented reports regarding her symptoms," if any, LIRAB

23

relied on in making its decision.  Omission of details about these reports in the decision and order make it difficult to determine whether LIRAB incorporated all reports by reference to the record as a whole.  If other reports were excluded, it is unclear whether LIRAB did not credit the content of these reports and thus did not include them, or did not find them persuasive in its PPD determination.  See HELCO, 60 Haw. at 642, 594 P.2d at 623-24 (holding reference to an "undigested transcript" on the record was not a substitute for a set of findings of fact).  Thus, the reference to this category of evidence without more specific findings or analytical clarification makes it difficult to track LIRAB's reasoning in this case.

Second, the LIRAB Chair's dissent more clearly explains the effect of evidence in either raising or lowering the PPD award percentage from the AMA rating.  In contrast, the LIRAB majority says that Noborikawa "suffered a loss of physical function of both the right and left legs" because of her injury, but does not specify the degree of loss of function, or whether it considered that "loss" significant or minimal.

The Chair specifies in his findings of fact that because Noborikawa's testimony regarding recurrent symptoms in both knees impact her daily home and work activities, Noborikawa suffered "significant loss of physical function."  (Emphasis

24

added.)  In his "Analysis/Discussion," he stated that he "review[ed] and [credited Noborikawa's] testimony regarding her severe functional/physical limitations . . . together with the significant impact of the bilateral knee injury on her basic activities."  (Emphases added.)  These adjectives inform this court as to the impact of the evidence on the dissent's reasoning.

We do not require agencies to state whether each and every piece of evidence helps or hurts a claimant or petitioner's cause.  But merely listing facts without basic analysis of their import on the agency's conclusions leaves this court no way to gauge whether the agency's decision was properly based in evidence on the record and the law.  For example, LIRAB could have indicated whether it thought Noborikawa's testimony indicated "mild" as opposed to "severe" impairment.  Unlike the dissent, though, LIRAB's findings lack language indicating what evidence weighed in favor of or supported its decision to award a lower PPD percentage.

We hold that the dissent's reasoning allows this court to review its determination.  We also hold that a 20% award for the right knee and 8% award is supported by the record as articulated by the dissent.

First, Noborikawa's significant decrease in functioning is supported by the record.  Dr. Chong and CHART Rehabilitation's

functional capacity assessments rated her for sedentary work. She was unable to return full-time to her former position as a restaurant and bar manager.  The vocational rehabilitation program assessed her skill set and recommended that she train to work as a medical coder and biller – a sedentary position.

Noborikawa's "significant loss of physical functioning" is also supported by her testimony at the LIRAB hearing credited by both the majority and the dissent.  The dissent credited "the significant impact of the bilateral knee injury on [Noborikawa's] basic activities."  Noborikawa testified to having to change how she cleans her home, lifts weights, and engages in hobbies like golfing or volunteering at her children's school.

The dissent also credited Noborikawa's testimony regarding her "severe functional/physical limitations."  Noborikawa testified to stiffness and achiness in her right knee, morning pain in her knee, and swelling and warmth in the knees in the evenings at the end of a day.  She also testified that she is unable to sit for an extended time, gets up to stand at least once every hour, requires chairs with sufficient support, and must be careful how she positions her legs.  Her left knee, she said, also makes occasional crackling and crunching sounds.

We hold that together, the impacts on Noborikawa's physical functionality and life activities, and her major decrease in

workplace physical functioning support a 20% right knee and 5% left knee PPD award.

This seemingly imprecise science, though, leaves much to be desired.  While the LIRAB chair offered more focused, traceable reasoning, he did not explain how he settled on a 20% right knee award as opposed to 30% or even 40%.  At oral argument, Host International stated that LIRAB tends to place a "ceiling" on PPD awards, not to exceed double the amount of the doctor's AMA rating.  No. SCWC-20-0000172, Tuesday, April 8, 2025, 9 a.m., Noborikawa v. Host International, YouTube, Oral Argument at 43:46-44:26, https://www.youtube.com/live/EnZhmji7N7E [https://perma.cc/H5F4-ATQ2].  So while LIRAB has discretion in awarding PPD, it seems to lack an articulated "formula" for reaching its PPD decisions.  We note that because LIRAB was not a party to this appeal, it did not weigh in on its own PPD award practices.

Untraceable or seemingly uncoordinated PPD awards create unfair results.  That's troubling.  Noborikawa argued that Dr. Langworthy's 2010 and 2016 ratings did not consider her 100% disability from her "very physical job."

> A secretary with a similar knee injury who was able to return to her original job at full duty might be entitled to a 7% PPD.  However, [Noborikawa] was previously required to lift 125 pound beer kegs at work. . . .  To say that [Noborikawa], who dropped 6 work categories [from "Very Heavy" to "Sedentary"] should be awarded the same 7% PPD that is awarded to a secretary, who dropped no work categories and who is able to resume full duty work at her old job, would not be fair, just or appropriate.

While inability to return to a prior position is a discretionary factor, this sedentary-versus-active profession example illustrates the problem with a blanket boost of a few percentage points above a physician's AMA Guide ratings.  See Ihara, 141 Hawai'i at 47, 404 P.3d at 313.

AMA ratings are only one of many factors LIRAB may consider.  According to HAR § 12-10-21(a), "Impairment rating guides issued by the American Medical Association, American Academy of Orthopedic Surgeons, and any other such guides which the director deems appropriate and proper may be used as a reference or guide in measuring a disability."  HAR § 12-10-21(a).  Per Ihara, LIRAB may then add additional percentage points to a physician's estimate of the permanent impairment depending on the magnitude of the impairment rating.  Ihara, 141 Hawai'i at 43, 404 P.3d at 309.  Ihara identified other factors such as "skills, education, job history, adaptability, age, and environment" that LIRAB may consider when an AMA Guide-based assessment "do[es] not truly reflect a claimant's loss."  See id. at 44, 404 P.3d at 310.

Ihara observed that "[t]he LIRAB's decisions show a marked pattern in which the Board considers factors other than the physician's impairment rating, such as whether the complainant is able to participate in the same types of hobbies and daily

and work activities as prior to the accident." Id. at 43, 404 P.3d at 309. Thus, "[w]here a physician's estimate of the permanent impairment under the AMA Guides is zero, [LIRAB] nonetheless has the discretion to find a determinate degree of impairment using standards not encompassed by the AMA Guides." Id. at 45, 404 P.3d 311.

Dr. Langworthy consulted Table 17-31 of the AMA Guides (5th Edition) to reach his impairment determinations. Titled "Arthritis Impairments Based on Roentgenographically Determined Cartilage Intervals," this table examines range of motion and cartilage intervals to determine an impairment percentage. AMA Guides at 544. Noborikawa pointed out, though, that range of motion is only one aspect of impairment. As Ihara held, this is why LIRAB has discretion to award PPD percentage points beyond a physician's informative, yet limited AMA rating. 141 Hawai'i at 45, 404 P.3d 311.

While we understand that workers' compensation requires a case-by-case inquiry, we encourage LIRAB to address whether its PPD determination procedures cause disparate outcomes based on profession. We suggest that to advance consistency and fairness, LIRAB consider establishing concrete categories or factors of review to determine the degree of an employee's partial permanent impairment.

One option may be to analyze changes in physical functioning through basic Activities of Daily Living (ADLs) and Instrumental Activities of Daily Living (IADLs). See Ihara, 141 Hawai'i at 45, 404 P.3d 311 (daily activities are one factor LIRAB may consider). According to Table 1-3 of the AMA Guides (6th Edition), ADLs include bathing, bowel and bladder management, dressing, eating, feeding, functional mobility, personal device care, personal hygiene and grooming, sexual activity, sleep/rest, and toilet hygiene. AMA Guides at 6-7. IADLS include care of others and pets, child rearing, communication device use, community mobility, financial management, health management and maintenance, home establishments and maintenance, meal preparation and cleanup, safety procedures and emergency response, and shopping. Id. While these categories are not explicitly work related, examining pre- and post-injury changes in these "basic" and instrumental physical functions is one concrete method of assessing the degree of an employee's physical impairment in all areas of life.

Here, based on Noborikawa's testimony, two of her ADLs (functional mobility and sleep) and two of her IADLs (community mobility and home establishment and maintenance) appear impacted. An employee whose ADLs and IADLs are impacted in more categories may receive a greater PPD award. Or an employee who

is only impacted in one category may receive a lesser PPD award.

Thus, examining these specific categories may better focus the

LIRAB inquiry into an employee's daily functioning.

We defer to LIRAB to standardize its PPD decisions. LIRAB,

in its expertise, may promulgate rules and evaluative categories

that impact a PPD award.

**C. The ICA did not err in holding that LIRAB considered Noborikawa's permanent disability from her Host International job**

An injured worker's inability to return to their pre-injury

job is a discretionary factor. See Ihara, 141 Hawai'i at 47, 404

P.3d at 313 ("[A] claimant's inability to perform [their] usual

and customary work activities legitimately may be considered in

determining PPD awards.") (emphasis added). As Cabatbat held,

LIRAB need not solely rely on a physician's AMA Guide rating.

Cabatbat v. Cnty. of Hawai'i, Dept. of Water Supply, 103 Hawai'i

1, 8-10, 78 P.3d 756, 763-65 (2003). Thus, LIRAB may consider

inability to perform usual and customary work activities in

addition to a physician's impairment evaluation. Ihara, 141

Hawai'i at 47, 404 P.3d at 313.

Noborikawa's concern that LIRAB listed, but did not analyze

her post-injury inability to return to work at Host

International speaks more to the issue of whether or not LIRAB's

reasoning sufficiently allows this court to assess how it

reached its decision, and whether on the record, LIRAB erred.

Because this factor was discretionary, Noborikawa's argument lacks merit. See id.

D.    **LIRAB erroneously relied on vocational rehabilitation and temporary total disability benefits to reduce Noborikawa's PPD award**

We hold that LIRAB erroneously considered Noborikawa's successful vocational rehabilitation and TTD benefits in determining her PPD award.

Noborikawa argues that LIRAB "egregiously held that [vocational rehabilitation] serves to reduce PPD." In its Discussion/Analysis, LIRAB explained Noborikawa's argument that her PPD was too low considering her 100% disability from her Host International job:

> [Noborikawa] argues that she should get a larger PPD award than a secretary (her example), who suffered the same injury and had the same residual symptoms, because that secretary is able to return to her usual and customary sedentary job; whereas, [Noborikawa], who had a more physically demanding job, is 100% disabled from her usual and customary job. [Noborikawa] contends that it would be unfair for her to receive a PPD award that is comparable to that of the secretary whose injury did not impact her ability to return to her pre-injury job.

LIRAB then held that this example lacks merit because each case is different:

> [Noborikawa's] argument is without merit. One cannot look only at the PPD award and conclude that the injured employee was or was not unfairly compensated for [their] injury. Each case is different and requires individual analysis.

Last, LIRAB concluded that Noborikawa's argument ignored other workers' compensation schemes that compensate workers for their inability to return to their pre-injury jobs:

32

> [Noborikawa's] position ignores the statutory scheme in which injured employees who are not able to return to their pre-injury job are entitled to additional or different benefits, such as VR [vocational rehabilitation] services and additional TTD benefits during VR, the purpose of which is reduce or remove barriers to reemployment.

Noborikawa argued that LIRAB's statement regarding the statutory scheme awarding vocational rehabilitation and TTD benefits improperly conflated PPD awards with TTD indemnity benefits.

Host International argued that this excerpt does not suggest LIRAB decreased its PPD award because Noborikawa received TTD benefits.  Rather, LIRAB was noting these "additional or different benefits" in response to Noborikawa's position that her PPD award was unfair because she could not return to her previous job.

We hold that LIRAB impermissibly relied on other non-PPD workers' compensation schemes to lower Noborikawa's PPD award.

Total disability benefits are wage replacement benefits intended to compensate an injured worker for loss of wage-earning capacity.  Ihara, 141 Hawai'i at 42, 46, 404 P.3d 308, 312.  Partial permanent disability benefits, on the other hand, compensate the worker for loss of bodily integrity, or the "loss or impairment of a physical or mental function."  Id. at 42, 404 P.3d 308.  "Unlike total disability, a PPD award is not based on the amount of wages lost."  Id.  Thus, "[a] PPD award is payable to the worker even if the worker returns to work, and the amount

of the award derives from the extent of a worker's impairment rather than [their] wage-earning capacity." Id. Thus, that a worker is compensated after their injury does not decrease the total PPD award. See id.

LIRAB's suggestion that Noborikawa's TTD benefits should impact her PPD award is improper. Because Noborikawa compared her 100% disability from her prior active work with a secretary able to return to a sedentary job, Noborikawa focused on loss of physical function impacting her work, not her wages. LIRAB's subsequent conclusion that these wage discrepancies are mitigated by TTD benefits and vocational rehabilitation services suggest that LIRAB considers these schemes as justification for lowering an employee's physical function-based PPD. Thus, Host International's argument that LIRAB was just commenting on "fairness" lacks merit.

We hold that receipt of TTD and vocational rehabilitation benefits are not factors LIRAB should consider when determining PPD awards. See Ihara, 141 Hawai'i at 42, 404 P.3d at 308.

## III.

We vacate the ICA's October 22, 2024 judgment and vacate in part LIRAB's February 19, 2020 decision and order. We hold that Noborikawa is entitled to 20% PPD for the right lower extremity and 5% PPD for the left lower extremity. The case is remanded

to LIRAB solely for a determination of the amount of

compensation to be awarded consistent with this opinion.

| | |
|---|---|
| Wayne H. Mukaida<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Jacqueline W.S. Amai<br>for respondent | /s/ Todd W. Eddins |
| | /s/ Lisa M. Ginoza |
| | /s/ Vladimir P. Devens |

